Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Joshua D. Smith (JS 3989)
RIVKIN RADLER LLP
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000
*Counsel for Plaintiffs Government Employees Insurance Company,*
*GEICO Indemnity Company, GEICO General Insurance Company,*
*and GEICO Casualty Company*

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------X

GOVERNMENT EMPLOYEES INSURANCE
COMPANY, GEICO INDEMNITY COMPANY,
GEICO GENERAL INSURANCE COMPANY, and
GEICO CASUALTY COMPANY,

                         Plaintiffs,

              -against-

PARKWAY MEDICAL CARE, P.C., B.Y., M.D., P.C.,
MK CHIROPRACTIC, P.C., JR CHIROPRACTIC,
P.C., CITY CARE ACUPUNCTURE, P.C., OLGA
BARD ACUPUNCTURE, P.C., and OASIS PHYSICAL
THERAPY, P.C.,

              -and-

BILLY N. GERIS, M.D., MEHRZAD KOHANSIEH,
D.C., CLEOPHAS CRAIGG, D.C., ARKADY KINER,
L.Ac., OLGA BARD, L.Ac., and MARY JEAN
ENDOZO, P.T.,

              -and-

DAVID SAFIR, ORION COLLECTIONS, INC., and
JOHN DOES "ONE" through "FIVE,"

                        Defendants.

------------------------------------------------------------X

Docket No.:_____(  )

**Plaintiffs Demand a Trial by Jury**

## COMPLAINT

    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company,

GEICO General Insurance Company, and GEICO Casualty Company (collectively "GEICO" or "Plaintiffs"), as and for their Complaint against the Defendants, hereby allege as follows:

**INTRODUCTION**

1.      This action seeks to recover more than $1,451,000.00 Dollars that the Defendants wrongfully have stolen from GEICO by engaging in a series of interrelated schemes involving the submission of thousands of fraudulent charges in the names of multiple professional corporations relating to a laundry list of unnecessary, excessive treatments (i.e., examinations, consultations, computerized range of motion and muscle testing, aqua-jet therapy, physical performance testing, somatosensory evoked potential testing, current perception threshold testing, EMG/NCV testing, F-wave and H-reflex studies, physical therapy, chiropractic, and acupuncture services) purportedly provided to persons who were involved in automobile accidents in New York and covered by policies of insurance issued by GEICO ("Insureds").

2.      The Defendants' interrelated fraudulent schemes have been perpetrated by several physicians, acupuncturists, chiropractors, physical therapists, and other licensed healthcare providers, who have served as the "front" for various professional corporations that are secretly and unlawfully owned and control by unlicensed laypersons and entities, mostly notably, David Safir, in contravention of New York law.

3.      The unlicensed layperson, David Safir, spearheaded the interrelated fraudulent schemes by recruiting the licensed healthcare providers, who were willing to "sell" their names and licenses to him, so that Safir and other laypersons and entities could illegally control and profit from a "revolving door" of professional corporations that generated large-scale fraudulent billing under New York's "No-Fault" law.  The unlicensed laypersons and entities established pre-determined treatment protocols in order to bill for voluminous, unnecessary and excessive

2

treatments that were provided (or purported to be provided) regardless of the actual medical needs of each individual Insured.

4. The fraudulent scheme can be summarized as follows:

(i) unlicensed laypersons purchased the use of the licenses of various healthcare professionals for a nominal sum or some ongoing payment, then used the licenses of those healthcare professionals to fraudulently incorporate professional corporations –Parkway Medical Care, P.C., B.Y., M.D., P.C., MK Chiropractic, P.C., JR Chiropractic, P.C., City Care Acupuncture, P.C., Olga Bard Acupuncture, P.C., and Oasis Physical Therapy, P.C. (collectively referred herein as the "PC Defendants");

(ii) the professional corporations served as vehicles through which fraudulent no-fault claims were submitted to GEICO – as well as other New York automobile insurers – for healthcare services allegedly provided to Insureds;

(iii) the unlicensed laypersons posed as "managers" and/or established "management" or "billing" companies to create the facade of business relationships with the professional corporations, but actually unlawfully owned and controlled the professional corporations, illegally fee split fees, and siphoned away the professional corporations' revenues to themselves; and

(iv) the defendants established pre-determined fraudulent treatment protocols dictated and directed by unlicensed laypersons using the professional corporations as the vehicles to bill for unnecessary, excessive treatment regardless of the actual medical needs of each individual Insured, to maximize the potential charges that they caused to be submitted to GEICO.

5. Through their fraudulent schemes, the Defendants stole more than $1.4 million from GEICO. In addition to seeking to recover these monies, GEICO seeks a declaration that it is not legally obligated to pay reimbursement of more than $1.4 million in pending fraudulent claims submitted by or through the PC Defendants. As set forth in detail below:

(i) the Defendants stole monies from GEICO and have no right to receive payment for any pending bills because the professional corporations were, and are, fraudulently incorporated, owned and controlled by non-physicians in violation of New York law, and therefore are ineligible to seek or recover no-fault benefits;

(ii)     the Defendants stole monies from GEICO and have no right to receive payment for any pending bills because they engaged in unlawful fee-splitting with non-physicians in violation of New York law;

(iii)    the Defendants stole monies from GEICO and have no right to receive payment for any pending bills since the services were not medically necessary and/or were excessive and provided – to the extent that they were provided at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)    the Defendants stole monies from GEICO and have no right to receive payment for any pending bills because the billing codes used to represent the services in the bills submitted to GEICO have misrepresented and exaggerated the level of services purportedly provided in order to inflate the charges submitted to GEICO; and

(v)     the Defendants stole monies from GEICO and have no right to receive payment for any pending bills because at least one of the Defendants engaged in illegal self-referrals in violation of material licensing laws.

6.      The Defendants fall into the following categories:

(i)     Defendants Billy N. Geris, M.D. ("Dr. Geris"), Mehrzad Kohansieh, D.C. ("Mehrzad"), Cleophas Craigg, D.C. ("Craigg"), Arkady Kiner, L.Ac ("Kiner"), Olga Bard, L.Ac ("Bard"), and Mary Jean Endozo, P.T. ("Endozo") (collectively the "Nominal Owner Defendants") are physicians, chiropractors, acupuncturists, and physical therapists licensed to practice medicine, chiropractic, acupuncture, and physical therapy in New York.

(ii)    Parkway Medical Care, P.C. ("Parkway Medical"), B.Y., M.D., P.C. ("BY MD"),[1] MK Chiropractic, P.C. ("MK Chiro"), JR Chiropractic, P.C. ("JR Chiro"), City Care Acupuncture, P.C. ("City Care Acu"), Olga Bard Acupuncture, P.C. ("Bard Acu"), and Oasis Physical Therapy, P.C. ("Oasis PT") are fraudulently incorporated medical, chiropractic, acupuncture, and physical therapy professional corporations, through which the fraudulent services purportedly were performed and billed to insurance companies, including GEICO.   The PC Defendants are fraudulently incorporated, inasmuch as they are secretly and unlawfully owned and controlled by unlicensed, non-professionals.

(iii)   Defendants David Safir ("Safir") and Orion Collections, Inc. ("Orion

---

[1] The listed owner of BY MD, Benjamin Yentel, M.D., is deceased.

4

Collections") are a layperson and lay entity, respectfully, that actually own and control the PC Defendants in violation of New York law; and

(iv)   John Does "One" through "Five" are persons and entities who are presently not identifiable but are associated with the PC Defendants, who are not licensed physicians, chiropractors, acupuncturists, or physical therapists, who illegally own and control the PC Defendants, and who were involved in the fraudulent scheme committed against GEICO and other New York automobile insurers, along with Safir and Orion Collections.   John Does "One" through "Five," Safir and Orion Collections are collectively the "Management Defendants."

7.      The Defendants' scheme was perpetrated from a single medical "clinic" located at 455 Ocean Parkway, Suite 1EFG in Brooklyn (the "455 Ocean Parkway Clinic"), which has been the source of a "revolving door" of healthcare providers used interchangeably by the Defendants to generate large scale fraudulent billing to insurers.

8.      Beginning no later than 2006, Safir and the other Management Defendants recruited a series of licensed healthcare professionals – many with suspect histories – to serve as fake or nominal owners of professional corporations that the Management Defendants created, controlled, and operated at the 455 Ocean Parkway Clinic.   These fraudulently incorporated professional corporations include the entities named as the PC Defendants herein, all of which used the same telephone number (718-282-3200).

9.      To obfuscate the Defendants' scheme, the Management Defendants used the various PC Defendants for limited time frames, changing the "billing" entities used as part of the scheme.

10.     In fact, the PC Defendants interchangeably "treated" the same patients who were purportedly treated by the prior professional corporations used at the 455 Ocean Parkway Clinic, in many instances purportedly at the same time (according to the billings from the companies), demonstrating that there was never any actual "sale," "transfer," or "dissolution" of a healthcare

practice by any legitimate professional owner.  Instead, the Management Defendants illegally owned, controlled, and profited from the provision of healthcare services by using a conglomerate of corporation names and licenses essentially "loaned" to them by the Nominal Owner Defendants to bill insurance companies at their will.

11.     As discussed below, the Defendants at all relevant times have known that:

(i)      the PC Defendants were fraudulently incorporated, owned, and controlled by unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits;

(ii)     the PC Defendants unlawfully split fees with unlicensed individuals and entities and, therefore, were ineligible to bill for or to collect no-fault benefits;

(iii)    the services that were billed to GEICO through the PC Defendants were ordered and performed – to the extent that they were performed at all – pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants, rather than to treat or otherwise benefit the Insureds who purportedly were subjected to them;

(iv)     many of services that were billed to GEICO through the PC Defendants were not medically necessary and were employed in order to misrepresent and exaggerate the level of services provided and to inflate the charges submitted to GEICO; and

(v)      certain of the Defendants were engaged in an illegal referral relationship to inflate and conceal the billings in violation of New York law.

12.     As such, the Defendants do not now have – and never had – any right to be compensated for the fraudulent services that have been billed to GEICO through the PC Defendants. The charts annexed hereto as Exhibits "1" through "7" summarize, in part, the fraudulent claims identified to date that the Defendants submitted, or caused to be submitted, to GEICO through the PC Defendants. The Defendants' interrelated fraudulent schemes have been ongoing for years and billing and collection efforts continued uninterrupted.  As a result of the Defendants' scheme, GEICO has incurred damages exceeding $1.4 million.

## THE PARTIES

### I.    The Plaintiffs

13.    Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company are Maryland corporations with their principal places of business in Chevy Chase, Maryland.

14.    GEICO is authorized to conduct business and to issue automobile insurance policies in New York.

### II.   The Defendants

#### A.    The Nominal Owner Defendants

15.    Defendant Dr. Geris is a physician who specializes in internal medicine, has been licensed to practice medicine in New York since July 9, 1996, and serves as the nominal owner of Parkway Medical.  Dr. Geris resides in and is a citizen of New Jersey.

16.    Defendant Mehrzad is a chiropractor who has been licensed to practice chiropractic services in New York since April 7, 1995, and serves as the nominal owner of MK Chiro.  Mehrzad resides in and is a citizen of New York.

17.    Defendant Craigg is a chiropractor who has been licensed to practice chiropractic services in New York since March 27, 2003, and serves as the nominal owner of JR Chiro. Craigg resides in and is a citizen of New York.

18.    Defendant Kiner is an acupuncturist who has been licensed to practice acupuncture in New York since October 26, 1999, and serves as the nominal owner of City Care Acu.  Kiner resides in and is a citizen of New Jersey.

19.    Defendant Bard is an acupuncturist who has been licensed to practice acupuncture in New York since January 16, 2004, and serves as the nominal owner of Bard Acu.  Bard resides

in and is a citizen of New York.

20.     Defendant Endozo is a physical therapist who has been licensed to practice physical therapy in New York since April 10, 2001, and serves as the nominal owner of Oasis PT.  Endozo resides in and is a citizen of New Jersey.

21.     Dr. Benjamin Yentel is not named as a defendant herein, but was a physician licensed to practice medicine in New York since March 1, 1966, and who served (prior to his death) as the nominal owner of defendant BY MD.

**B.      The PC Defendants**

22.     Defendant Parkway Medical is a New York professional service corporation with its principal place of business in New York.  Parkway Medical was fraudulently incorporated beginning in New York on or about April 5, 2011 and has been owned on paper by Dr. Geris, but in actuality is owned and controlled by the Management Defendants in contravention of New York law.

23.     Defendant BY MD is a New York professional service corporation with its principal place of business in New York.  BY MD was fraudulently incorporated in New York beginning on or about May 12, 2006 and had been owned on paper by Dr. Yentel, prior to his death, but in actuality was owned and controlled by the Management Defendants in contravention of New York law.

24.     Defendant MK Chiro is a New York professional service corporation with its principal place of business in New York.  MK Chiro was fraudulently incorporated in New York beginning on or about July 28, 2008 and has been owned on paper by Mehrzad, but in actuality is owned and controlled by the Management Defendants in contravention of New York law.

25.     Defendant JR Chiro is a New York professional service corporation with its principal place of business in New York.  JR Chiro was fraudulently incorporated in New York beginning on or about December 12, 2006 and has been owned on paper by Craigg, but in actuality is owned and controlled by the Management Defendants in contravention of New York law.

26.     Defendant City Care Acu is a New York professional service corporation with its principal place of business in New York.  City Care Acu was fraudulently incorporated in New York beginning on or about November 5, 2007 and has been owned on paper by Kiner, but in actuality is owned and controlled by the Management Defendants in contravention of New York law.

27.     Defendant Bard Acu is a New York professional service corporation with its principal place of business in New York.  Bard Acu was fraudulently incorporated in New York beginning on or about November 1, 2004 and has been owned on paper by Bard, but in actuality is owned and controlled by the Management Defendants in contravention of New York law.

28.     Defendant Oasis PT is a New York professional service corporation with its principal place of business in New York.  Oasis PT was fraudulently incorporated in New York beginning on or about August 21, 2006 and has been owned on paper by Endozo, but in actuality is owned and controlled by the Management Defendants in contravention of New York law.

**C.     The Management Defendants**

29.     Defendant Safir resides in and is a citizen of New York.  Safir never has been a licensed physician or medical professional, yet secretly owns, controls, and derives economic benefit from the operation of the PC Defendants in contravention of New York law.  Safir also owns and controls Defendant Orion Collections.

30.     Defendant Orion Collections is a New York corporation with its principal place of business in New York.  Orion Collections was incorporated in New York on or about December 14, 2006, and has been used to illegally own and control one or more of the PC Defendants in contravention of New York law.

31.     Defendants John Does "One" through "Five" reside in and are citizens of the State of New York.  John Does "One" through "Five" are individuals and entities who are presently not identifiable but associated with the PC Defendants, who are not licensed physicians, who truly own and control one or more of the PC Defendants in violation of New York law, who siphon off the PC Defendants' profits to themselves, and who are involved in the fraudulent scheme committed against GEICO.

## JURISDICTION AND VENUE

32.     This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1332(a)(1) because the matter in controversy exceeds the sum or value of $75,000.00, exclusive of interest and costs, and is between citizens of different states. Pursuant to 28 U.S.C. § 1331, this Court also has jurisdiction over the claims brought under 18 U.S.C. § 1961 et seq. (the Racketeer Influenced and Corrupt Organizations ("RICO") Act) because they arise under the laws of the United States.  In addition, this Court has supplemental jurisdiction over the subject matter of the claims asserted in this action pursuant to 28 U.S.C. § 1367.

33.     Venue in this District is appropriate pursuant to 28 U.S.C. § 1391, as the Eastern District of New York is the District where one or more of the Defendants reside and because this is the District where a substantial amount of the activities forming the basis of the Complaint occurred.

## ALLEGATIONS COMMON TO ALL CLAIMS

I.   **An Overview Of The No-Fault Laws And Licensing Statutes**

34.   GEICO underwrites automobile insurance in New York.

35.   New York's No-Fault laws are designed to ensure that injured victims of motor vehicle accidents have an efficient mechanism to pay for and receive the healthcare services that they need. Under New York's Comprehensive Motor Vehicle Insurance Reparations Act (N.Y. Ins. Law §§ 5101, et seq.) and the regulations promulgated pursuant thereto (11 N.Y.C.R.R. §§ 65, et seq.)(collectively referred to as the "No-Fault Laws"), automobile insurers are required to provide Personal Injury Protection Benefits ("No-Fault Benefits") to Insureds.

36.   No-Fault Benefits include up to $50,000.00 per Insured for necessary expenses that are incurred for health care goods and services.

37.   An Insured can assign his or her right to No-Fault Benefits to the providers of healthcare services in exchange for those services.  Pursuant to a duly executed assignment, a healthcare provider may submit claims directly to an insurance company within forty-five days of the date of service and receive payment for medically necessary services, using the claim form required by the New York State Department of Insurance (known as "Verification of Treatment by Attending Physician or Other Provider of Health Service" or more commonly as an "NF-3"). In the alternative, a healthcare provider may submit claims using the Health Care Financing Administration insurance claim form (known as the "HCFA-1500 Form").

38.   The No-Fault Laws obligate individuals and healthcare providers that seek payment of No-Fault Benefits to provide insurers with additional verification in order to establish proof of their claims.

39.   Pursuant to the No-Fault Laws, professional corporations are not eligible to bill

for or collect No-Fault Benefits if they were fraudulently incorporated. In New York, only a licensed healthcare professional may: (i) practice medicine or a healthcare profession; (ii) own or control a professional corporation authorized to practice medicine or a healthcare profession; (iii) employ or supervise other physicians or healthcare professionals; and (iv) derive economic benefit from physician or healthcare professional services. In New York, unlicensed laypersons may not: (i) practice medicine or a healthcare profession; (ii) own or control a professional corporation authorized to practice medicine or a healthcare profession; (iii) employ or supervise physicians or healthcare professionals; or (iv) derive economic benefit from physician or professional healthcare services.

40.     In State Farm Mut. Auto. Ins. Co. v. Mallela, 4 N.Y.3d 313, 320 (2005), the New York Court of Appeals made clear that healthcare providers that fail to comply with material licensing requirements are ineligible to collect No-Fault Benefits, and that insurers may look beyond a facially-valid license to determine whether there was a failure to abide by state and local law.

41.     Pursuant to the No-Fault Laws, health care service providers are not eligible to receive No-Fault Benefits if they engage in fee-splitting, which is prohibited by, inter alia, New York's Education Law.

42.     Additionally, New York law requires that the shareholders of a professional corporation be engaged in the practice of their profession through the professional corporation in order for it to be lawfully licensed. Under the No-Fault Laws, professional corporations are not eligible to receive No-Fault Benefits if they are owned by professionals who do not engage in the practice of their profession through the professional corporation.

43.    The Superintendent of Insurance had adopted a specific regulation, 11 N.Y.C.R.R.

§ 65-3.16(a)(12), providing, in pertinent part, as follows:

> A provider of health care services is not eligible for reimbursement
> under section 5102(a)(1) of the Insurance Law if the provider fails
> to meet <u>any</u> applicable New York State or local licensing
> requirement necessary to perform such service in New York … .
> (emphasis supplied)

44.    Pursuant to the No-Fault Laws, only health care providers in possession of a direct

assignment of benefits are entitled to bill for or collect No-Fault Benefits.  There is both a

statutory and regulatory prohibition against payment of No-Fault Benefits to anyone other than

the patient or his/her healthcare provider.  The implementing regulation adopted by the

Superintendent of Insurance, 11 N.Y.C.R.R. § 65-3.11, provides, in pertinent part, as follows:

> An insurer shall pay benefits for any element of loss … <u>directly</u> to
> the applicant or … upon assignment by the applicant …. shall pay
> benefits <u>directly</u> to providers of health care services as covered
> under section five thousand one hundred two (a)(1) of the
> Insurance Law… . (emphasis supplied)

45.    For a healthcare provider to be eligible to bill for and to collect charges from an

insurer for healthcare services pursuant to N.Y. Ins. Law § 5102(a), it must be the actual provider

of the service.  Under the No-Fault Laws, a professional service corporation is not eligible to bill

for services, or to collect for those services from an insurer, where the services were rendered by

persons who are not employees of the professional corporation, such as independent contractors.

46.    Pursuant to N.Y. Ins. Law § 403, all bills submitted by a healthcare provider to

GEICO and all other insurers must be verified by the healthcare provider subject to – in

substance – the following warning:

> Any person who knowingly and with intent to defraud any
> insurance company or other person files an application for
> insurance or statement of claim containing any materially false
> information, or conceals for the purpose of misleading, information

13

concerning any fact material thereto, commits a fraudulent insurance act, which is a crime … .

## II.   The Fraudulent Incorporation And Operation Of The PC Defendants

### A.   Relevant Background Information

47.   This case involves a series of interrelated fraudulent schemes through which licensed physicians and healthcare professionals allowed their licenses to be purchased by unlicensed individuals.  These unlicensed individuals used the medical or healthcare licenses to fraudulently incorporate professional corporations, which then were used as conduits to submit fraudulent No-Fault billing to insurers from a medical "clinic" located at 455 Ocean Parkway, Suite 1EFG in Brooklyn (defined above as the "455 Ocean Parkway Clinic").

48.   The Management Defendants (including Safir and John Does "One" through "Five") controlled the 455 Ocean Parkway Clinic, including all of the healthcare providers operating within that clinic, by directing the provision of healthcare services pursuant to a pre-determined protocol, solely to maximize the billing submitted to insurers and increase the profits available to be siphoned off by them.  Under the direction and control of the Management Defendants, the PC Defendants billed insurers for a laundry-list of unnecessary and excessive healthcare services.

49.   To conceal their true ownership and control of the PC Defendants while simultaneously effectuating pervasive, total control over their operation and management, Safir and the other Management Defendants arranged to have the PC Defendants and the Nominal Owner Defendants (and Dr. Yentel) "hire" them as purported managers or billers and/or enter into a series of "billing", "collection" or other agreements with the Management Defendants, and further arranged to have a laundry list of excessive services billed through the professional corporations for services performed at the 455 Ocean Parkway Clinic.  In fact, Orion Collections

14

operated from the same location as the PC Defendants, while Safir has been a constant presence at the clinic controlling all billing, collections, and payroll – and the PC Defendants themselves.

50.     The "billing" "collections" and/or other arrangements were a sham, as they called for exorbitant payments from the PC Defendants and had no relationship to the PC Defendant's actual cost for the services provided.  The sham arrangements ensured that: (i) the professional corporations remained in constant debt to the Management Defendants; (ii) the Management Defendants could completely own and control the day-to-day operations of the professional corporations; (iii) the Management Defendants could exercise total supervisory authority over the professional corporations; and (iv) the Management Defendants could siphon off the revenues generated by the billing submitted to GEICO and other insurers through the professional corporations and illegally profit from the practice of medicine or other professions.

51.     During all relevant times, the Nominal Owner Defendants (as well as Dr. Yentel) exercised no control over or ownership interest in the PC Defendants.  All decision-making authority relating to the operation and management of the PC Defendants had been vested entirely with the Management Defendants.

52.     The Nominal Owner Defendants (and Dr. Yentel) did not control or maintain any of the PC Defendants' books or records, including their bank accounts; did not select, direct, and/or control any of the individuals or entities that were responsible for handling any aspect of the PC Defendants' financial affairs; and were completely unaware of the most fundamental aspects of how the PC Defendants operated.  In reality, the Nominal Owner Defendants (and Dr. Yentel) were nothing more than *de facto* employees of the Management Defendants.

53.     In addition to controlling the operations, finances, and management of the PC Defendants, Safir, Orion Collections, and the other Management Defendants established,

supervised, and controlled the referral arrangements, the treatment and billing protocols, and ultimately the provision of the healthcare services rendered under the name of each of the PC Defendants at the 455 Ocean Parkway Clinic.

54.     Throughout their operation, the Management Defendants operated the PC Defendants with a "revolving door" mentality, simply changing the name of the professional corporation and the identity of the purported owner without identifying by signage or otherwise the professional's ownership or association with the facility.   Indeed, aside from the PC Defendants, there have been other professional corporations' names used at the 455 Ocean Parkway Clinic over the years to further the scheme, including AB Medical, P.C. and BG Medical, P.C.  All of these purportedly separately owned professional corporations operated out of the same suite location and used the same phone number for their billing, which was controlled by the Management Defendants.

55.     Moreover, despite the change of professional corporations and nominal owners at the 455 Ocean Parkway Clinic, the provision of healthcare services at the clinic remained virtually the same for years, as such services were directed and controlled by the Management Defendants, and provided and billed without regard for the actual medical needs of each individual Insured.

56.     In addition, neither the Nominal Owner Defendants, Dr. Yentel nor the PC Defendants at the clinic ever bothered to advertise or market their services to the general public; yet the PC Defendants billed GEICO and other insurers at an extremely high rate.

57.     Although the Nominal Owner Defendants (and Dr. Yentel) have been listed as the owners of the PC Defendants on the certificates of incorporation, they exercised no ownership or control over the health care services provided or the profits generated from the medical

professional corporations. Instead, the day-to-day operations, supervisory control, and true ownership of the PC Defendants rested in the hands of Safir and the other Management Defendants.

58.     The ownership and control of the PC Defendants by the Management Defendants compromised patient care and resulted in unnecessary and excessive treatment, testing, and billing, as the provision of health services by the PC Defendants was subject to the control and pecuniary interests of non-health care providers as opposed to the independent medical judgment of true health care providers.   The ownership and control of the PC Defendants by non-health care providers renders them ineligible to bill for and collect No-Fault Benefits under the No-Fault Law.

**B.**     **The Fraudulent Incorporation of the Medical Professional Corporations**

(i)     The Fraudulent Incorporation and Operation of BY MD

59.     As discussed above, the Defendants' fraudulent scheme involved, among other things, using the Nominal Owner Defendants' names and licenses as the "paper" owners of a series of professional corporations, which the Management Defendants opened and closed at will in order to bill the New York automobile insurance industry for millions of dollars that Defendants were not eligible to receive.   The initial medical professional corporation in this series of corporations that is part of the scheme referenced in this complaint was listed under Dr. Yentel's name as BY MD.

60.     In 2006, the Management Defendants recruited Dr. Yentel who was willing to "sell" his medical license to the Management Defendants and permitted them to fraudulently incorporate BY MD and use it to submit large-scale fraudulent billing to insurers.

61.     Dr. Yentel was amendable to participating in the fraudulent scheme because he had previously been sanctioned for professional misconduct, resulting in his medical license being placed on probation for a duration of three years, and thus making it difficult for Dr. Yentel to obtain legitimate employment.

62.     Specifically, on or about October 30, 1997, the State Board For Professional Medical Conduct found Dr. Yentel guilty of professional misconduct for his following actions:

(i)      failing to document the medical necessity of medications;

(ii)     taking inadequate patient histories;

(iii)    failing to substantiate diagnoses;

(iv)    performing inadequate physical exams;

(v)     inadequately evaluating patient complaints;

(vi)    prescribing medications in improper dosages;

(vii)   prescribing Tetracycline to a woman who was six months pregnant; and

(viii)  prescribing a dosage of Penicillin for two children in excess of the generally accepted dosage for children.

63.     To circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing BY MD to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Yentel.  In exchange for a designated salary or other form of compensation, in May 2006, Dr. Yentel agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of BY MD and that he truly owned, controlled and practiced through the professional corporation.  Dr. Yentel agreed to the

18

scheme knowing that the professional corporation would be used by the Management Defendants as a vehicle to submit fraudulent billing to insurance companies.

64.     Soon thereafter, Dr. Yentel ceded true ownership and control over the professional corporation to the Management Defendants.   The Management Defendants caused the professional corporation to begin operating from the 455 Ocean Parkway Clinic, which they controlled.

65.     At the clinic, Safir posed as the office/collections manager for the professional corporation, but, in actuality, controlled and owned the professional corporation, directing the fraudulent services that were performed.

66.     Dr. Yentel never was the true shareholder, director, or officer of BY MD, and never had any true ownership interest in or control over the professional corporation.   True ownership and control over BY MD rested at all times entirely with the Management Defendants, who used the facade of BY MD to do indirectly what they are forbidden from doing directly, namely to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

67.     The Management Defendants, rather than Dr. Yentel, provided all start-up costs and investment in BY MD.   Dr. Yentel did not incur any costs to establish BY MD's practice, nor did he invest any money in the professional corporation he purportedly owned.

68.     BY MD did not advertise or market its services to the general public.

69.     The Management Defendants continually described BY MD's practice by non-descript signage to the public, without indicating or advertising the name of BY MD or Dr. Yentel as the owner, as one would expect if the medical provider was truly owned and controlled by him.

70.     Dr. Yentel and BY MD relied on the Management Defendants to generate patients for the 455 Ocean Parkway Clinic.

71.     BY MD is simply another "name" used by the Management Defendants at the 455 Ocean Parkway Clinic, as the telephone number listed on all its bills, reports, and other documentation is the same exact telephone number used by every other professional corporation that has operated at the 455 Ocean Parkway Clinic.

72.     In addition, the treatment records and medical reports used by BY MD were boilerplate and similar in nature to those used by Parkway Medical –which operated at the 455 Ocean Parkway Clinic at a different point in time and which was purportedly owned by a separate physician. In fact, both of these professional corporations submitted physical therapy evaluation forms with the exact word – therapy – misspelled as "Thepapy."

73.     Dr. Yentel also did not hire or train any of the employees at BY MD. Instead, the Management Defendants performed all of the hiring and supervision of medical, technical, and administrative personnel at BY MD.

74.     In fact, Endozo (named herein as one of the Nominal Owner Defendants) was an alleged employee of BY MD even though she also rendered services for her own physical therapy corporation, Oasis PT, which also happened to operate from the 455 Ocean Parkway Clinic.

(ii)     The Fraudulent Incorporation and Operation of Parkway Medical

75.     In 2011, the Management Defendants recruited Dr. Geris, who was willing to "sell" his medical license to the Management Defendants and permitted them to fraudulently incorporate Parkway Medical and use it to submit large-scale fraudulent billing to insurers.

76.     As they had done with Dr. Yentel and BY MD, in order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing

Parkway Medical to operate a medical practice, the Management Defendants entered into a secret scheme with Dr. Geris. In exchange for a designated salary or other form of compensation, in April 2011, Dr. Geris agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of Parkway Medical and that he truly owned, controlled and practiced through the professional corporation. Dr. Geris agreed to the scheme knowing that the professional corporation would be used by the Management Defendants as a vehicle to submit fraudulent billing to insurance companies.

77.     Soon thereafter, Dr. Geris ceded true ownership and control over the professional corporation to the Management Defendants.   The Management Defendants caused the professional corporation to begin operating from the 455 Ocean Parkway Clinic, which they controlled.

78.     At the clinic, Safir posed as the office/collections manager for the professional corporation, but, in actuality, controlled and owned the professional corporation, directing the fraudulent services that were performed.

79.     Dr. Geris has never been the true shareholder, director, or officer of Parkway Medical, and has never had any true ownership interest in or control over the professional corporation. True ownership and control over Parkway Medical has rested at all times entirely with the Management Defendants, who used the facade of Parkway Medical to do indirectly what they are forbidden from doing directly, namely to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

80.     The Management Defendants, rather than Dr. Geris, provided all start-up costs

and investment in Parkway Medical.

81.     Dr. Geris did not incur any costs to establish Parkway Medical's practice, nor did he invest any money in the professional corporation he purportedly owned.

82.     Parkway Medical did not advertise or market its services to the general public.

83.     The Management Defendants continually described Parkway Medical's practice by non-descript signage to the public, without indicating or advertising the name of Parkway Medical or Dr. Geris as the owner, as one would expect if the medical provider was truly owned and controlled by him.

84.     Dr. Geris and Parkway Medical relied on the Management Defendants to generate patients for the 455 Ocean Parkway Clinic.

85.     Like the other professional corporations that have operated at the 455 Ocean Parkway Clinic, Parkway Medical did not have its own telephone number. The telephone number listed on all its bills, reports and other documentation was the same exact telephone number used by all healthcare providers that operated out of that location, despite each healthcare provider purportedly being owned by different professionals.

86.     In addition, the treatment records and medical reports used by Parkway Medical were boilerplate and similar in nature to those used by BY MD, which operated at the 455 Ocean Parkway Clinic at a different point in time and which was purportedly owned by a separate physician.  In fact, both of these professional corporations submitted physical therapy evaluation forms with the exact word – therapy – misspelled as "Thepapy."

87.     Dr. Geris also did not hire or train any of the employees at Parkway Medical. Instead, the Management Defendants performed all of the hiring and supervision of medical, technical, and administrative personnel at Parkway Medical.

88.     In fact, Endozo (named herein as one of the Nominal Owner Defendants) was an alleged employee of Parkway Medical even though she also rendered services for her own physical therapy corporation, Oasis PT, which also happened to operate from the 455 Ocean Parkway Clinic.

89.     In an effort to conceal the scheme, in 2011, the Management Defendants "swapped" out Parkway Medical, and in its place yet another professional corporation, Jamaica Wellness Medical PC ("Jamaica Wellness"), began operating at the 455 Ocean Parkway Clinic.

90.     During a May 6, 2013 examination under oath, Jamaica Wellness's alleged owner, Dr. Brij Mittal, gave testimony indicating that he simply walked in and "took over" the existing medical practice at the 455 Ocean Parkway Clinic – with the same staff, same billing and collection personnel, same medical equipment, and same patient base – but without paying the prior "owner" – Dr. Geris -- anything, without purchasing the medical equipment, and without having any written agreement.  Safir, tellingly, "was already working" at the Clinic, including being in charge of, among other things, billing and collection activities.  Safir continued in his "role" at the Clinic, notwithstanding the purported change from one practice to another.

91.     At bottom, all employees and healthcare providers that worked at the 455 Ocean Parkway Clinic were used and billed interchangeably by the Management Defendants as part of the "revolving door" of professional corporations that they controlled to further their scheme.

**C.     The Fraudulent Incorporation of the Chiropractic Professional Corporations**

(i)     The Fraudulent Incorporation of JR Chiro

92.     The Defendants' fraudulent scheme also involved the use of chiropractors.  In or around late 2006, the Management Defendants recruited Craigg, who was willing to "sell" his chiropractic license to the Management Defendants and permitted them to fraudulently

incorporate JR Chiro and use it to submit large-scale fraudulent billing to insurers.

93.    In order to circumvent New York law and to induce the Department of Education to issue certificates of authority permitting JR Chiro to engage in chiropractic services, the Management Defendants entered into a secret arrangement with Craigg.  In exchange for a designated salary or other form of compensation, Craigg agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of JR Chiro and that he truly owned, controlled and practiced through the professional corporation.  Craigg agreed to the scheme knowing that the professional corporation would be used by the Management Defendants as a vehicle to submit fraudulent billing to insurance companies.

94.    Soon thereafter, Craigg ceded true ownership and control over the professional corporation to the Management Defendants.  The Management Defendants caused the professional corporation to begin operating from the 455 Ocean Parkway Clinic, which they controlled.

95.    At the clinic, Safir posed as the office/collections manager for the professional corporation, but, in actuality, controlled and owned the professional corporation, directing the fraudulent services that were performed.

96.    Craigg has never been the true shareholder, director, or officer of JR Chiro, and has never had any true ownership interest in or control over the professional corporation.  True ownership and control over JR Chiro has rested at all times entirely with the Management Defendants, who use the facade of JR Chiro to do indirectly what they are forbidden from doing directly, namely to: (i) employ other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

97.     The Management Defendants, rather than Craigg, provided all start-up costs and investment in JR Chiro.

98.     Craigg did not incur any costs to establish JR Chiro's practice, nor did he invest any money in the professional corporation he purportedly owned.

99.     JR Chiro did not advertise or market its services to the general public.

100.     The Management Defendants continually described JR Chiro's practice by non-descript signage to the public, without indicating or advertising the name of JR Chiro or Craigg as the owner, as one would expect if the medical provider was truly owned and controlled by him.

101.     Craigg and JR Chiro relied on referrals from healthcare providers operating out of the 455 Ocean Parkway Clinic, generated by the Management Defendants.

102.     Further, JR Chiro did not have its own telephone number.  The telephone number listed on JR Chiro's bills, reports and other documentation was the same exact telephone number used by the other professional corporations operating at the 455 Ocean Parkway Clinic and registered to the Management Defendants.

(ii)     The Fraudulent Incorporation and Operation of MK Chiro

103.     In or around 2008, the Management Defendants recruited Mehrzad, who was willing to "sell" his chiropractic license to the Management Defendants and permitted them to fraudulently incorporate MK Chiro and use it to submit large-scale fraudulent billing to insurers.

104.     In order to circumvent New York law and to induce the Department of Education to issue certificates of authority permitting MK Chiro to engage in chiropractic services, the Management Defendants entered into a secret arrangement with Mehrzad.  In exchange for a designated salary or other form of compensation, Mehrzad agreed to falsely represent in the

certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of MK Chiro and that he truly owned, controlled and practiced through the professional corporation.  Mehrzad agreed to the scheme knowing that the professional corporation would be used by the Management Defendants as a vehicle to submit fraudulent billing to insurance companies.

105.    Soon thereafter, Mehrzad ceded true ownership and control over the professional corporation to the Management Defendants. The Management Defendants caused the professional corporation to begin operating from the 455 Ocean Parkway Clinic, which they controlled.

106.    At the clinic, Safir posed as the office/collections manager for the professional corporation, but, in actuality, controlled and owned the professional corporation, directing the fraudulent services that were performed.

107.    Mehrzad has never been the true shareholder, director, or officer of MK Chiro, and has never had any true ownership interest in or control over the professional corporation. True ownership and control over MK Chiro has rested at all times entirely with the Management Defendants, who use the facade of MK Chiro to do indirectly what they are forbidden from doing directly, namely to: (i) employ other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

108.    The Management Defendants, rather than Mehrzad, provided all start-up costs and investment in MK Chiro.

109.    Mehrzad did not incur any costs to establish MK Chiro's practice, nor did he invest any money in the professional corporation he purportedly owned.

110.    MK Chiro did not advertise or market its services to the general public.

111.    The Management Defendants continually described MK Chiro's practice by non-descript signage to the public, without indicating or advertising the name of MK Chiro or Mehrzad as the owner, as one would expect if the medical provider was truly owned and controlled by him.

112.    Mehrzad and MK Chiro relied on referrals from healthcare providers operating out of the 455 Ocean Parkway Clinic, which were generated and directed by the Management Defendants.

113.    Further, MK Chiro did not have its own telephone number. The telephone number listed on MK Chiro's bills, reports and other documentation was the same exact telephone number used by the other professional corporations operating at the 455 Ocean Parkway Clinic and registered to the Management Defendants.

114.    In an effort to conceal the scheme, in or around 2012, the Management Defendants "swapped" out MK Chiro and in its place yet another chiropractic PC, United Wellness Chiropractic, PC ('United Wellness"), began operating.

115.    At an Examination Under Oath on May 13, 2013, United Wellness's alleged owner, Marc Lampa, gave testimony indicating that he took over MK Chiro's practice without paying any monies whatsoever to Mehrzad, that he acquired MK Chiro's patient load, and that he obtained the use of all the chiropractic equipment at the 455 Ocean Parkway address for free.

**D.    The Fraudulent Incorporation of the Acupuncture Professional Corporations**

(i)    <u>The Fraudulent Incorporation and Operation of Bard Acu</u>

116.    The Defendants' fraudulent scheme also involved the use of acupuncturists.  In about late 2006, the Management Defendants recruited Bard who was willing to "sell" her acupuncturist license to the Management Defendants and permitted them to fraudulently operate

Bard Acu, a professional corporation that had been set up under Bard's name in the past, so that Bard Acu could be used to submit large-scale fraudulent billing to insurers.

117.    Bard had incorporated Bard Acu back in 2004 for purposes of practicing acupuncture in the State of New York.  Thereafter, the professional corporation was essentially dormant, until the Management Defendants entered into a secret scheme with Bard.

118.    In or around 2006, in order to circumvent New York law and to induce the State Education Department to continue to recognize Bard Acu as a physician-owned and controlled professional corporation, Bard, in exchange for a designated salary or other form of compensation from the Management Defendants, agreed to continue to represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she was the true shareholder, director and officer of Bard Acu and that she continued to truly own, control and practice through the professional corporation.  Bard agreed to the scheme knowing that the professional corporation would be used by the Management Defendants as a vehicle to submit fraudulent billing to insurance companies.

119.    Soon thereafter, Bard ceded true ownership and control over the professional corporation to the Management Defendants. The Management Defendants caused the professional corporation to begin operating from the 455 Ocean Parkway Clinic, which they controlled.

120.    At the clinic, Safir posed as the office/collections manager for the professional corporation, but, in actuality, controlled and owned the professional corporation, directing the fraudulent services that were performed.

121.    Bard has never been the true shareholder, director, or officer of Bard Acu, and has never had any true ownership interest in or control over the professional corporation. True

ownership and control over Bard Acu has rested at all times entirely with the Management Defendants, who use the facade of Bard Acu to do indirectly what they are forbidden from doing directly, namely to: (i) employ other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

122.    The Management Defendants, rather than Bard, provided all start-up costs and investment in Bard Acu.

123.    Bard did not incur any costs to establish Bard Acu's practice, nor did she invest any money in the professional corporation she purportedly owned.

124.    Bard Acu did not advertise or market its services to the general public.

125.    The Management Defendants continually described Bard Acu's practice by non-descript signage to the public, without indicating or advertising the name of Bard Acu or Bard as the owner, as one would expect if the medical provider was truly owned and controlled by her.

126.    Bard and Bard Acu relied on referrals from healthcare providers operating out of the 455 Ocean Parkway Clinic that were generated and directed by the Management Defendants.

127.    Further, Bard Acu did not have its own telephone number.  The telephone number listed on Bard Acu's bills, reports and other documentation was the same exact telephone number used by the other professional corporations operating at the 455 Ocean Parkway Clinic and registered to the Management Defendants.

128.    Notably, the paper owner of Bard Acu – Bard –pled guilty to fraud and concealing her involvement in a scheme to defraud no-fault insurance carriers. See USA v. Kaplan, et al., Docket No. 1:11-cr-00892 (RMB).

(ii)    The Fraudulent Incorporation and Operation of City Care Acu

129.     In or around late 2007, the Management Defendants recruited Kiner, who was willing to "sell" his acupuncturists license to the Management Defendants and permitted them to fraudulently incorporate City Care Acu and use it to submit large-scale fraudulent billing to insurers.

130.     Kiner himself has a long history of being associated with suspect No-Fault clinics, appearing as the purported "owner" of at least twelve professional corporations operating in New York, despite the fact that (i) he does not actually practice acupuncture through the professional corporations and (ii) he resides in New Jersey rarely appearing in the clinics.

131.     During the time City Care Acu was operating at the 455 Ocean Parkway Clinic, Kiner also purportedly owned: (i) EMA Acupuncture, P.C.; (ii) Arnica Acupuncture, P.C.; (iii) Gentle Care Acupuncture, P.C.; (iv) American Acupuncture Therapeutics, P.C.; (v) Apple Tee Acupuncture, P.C.; (vi) 21st Century Acupuncture, P.C.; (vii) East Coast Acupuncture, P.C.; (viii) Broad Street Acupuncture, P.C.; (ix) New Age Acupuncture, P.C.; (x) Raz Acupuncture, P.C.; (xi) DVA Acupuncture, P.C.; and (xii) Contemporary Acupuncture, P.C..

132.     In order to circumvent New York law and to induce the Department of Education to issue certificates of authority permitting City Care Acu to engage in acupuncture services, the Management Defendants entered into a secret arrangement with Kiner.  In exchange for a designated salary or other form of compensation, Kiner agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that he was the true shareholder, director and officer of City Care Acu and that he truly owned, controlled and practiced through the professional corporation.  Kiner agreed to the scheme knowing that the professional corporation would be used by the Management Defendants as a vehicle to submit fraudulent billing to insurance companies.

133.   Soon thereafter, Kiner ceded true ownership and control over the professional corporation to the Management Defendants. The Management Defendants caused the professional corporation to begin operating from the 455 Ocean Parkway Clinic, which they controlled.

134.   At the clinic, Safir posed as merely the office/collections manager for the professional corporation, but, in actuality, controlled and owned the professional corporation, directing the fraudulent services that were performed.

135.   Kiner has never been the true shareholder, director, or officer of City Care Acu, and has never had any true ownership interest in or control over the professional corporation. True ownership and control over City Care Acu has rested at all times entirely with the Management Defendants, who use the facade of City Care Acu to do indirectly what they are forbidden from doing directly, namely to: (i) employ other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

136.   The Management Defendants, rather than Kiner, provided all start-up costs and investment in City Care Acu. Kiner did not incur any costs to establish City Care Acu's practice, nor did he invest any money in the professional corporation he purportedly owned.

137.   City Care Acu did not advertise or market its services to the general public.

138.   The Management Defendants continually described City Care Acu's practice by non-descript signage to the public, without indicating or advertising the name of City Care Acu or Kiner as the owner, as one would expect if the medical provider was truly owned and controlled by him.

139.   Kiner and City Care Acu relied on referrals from healthcare providers operating out of the 455 Ocean Parkway Clinic that were generated and directed by the Management

31

Defendants.

140.    Further, City Care Acu did not have its own telephone number. The telephone number listed on City Care Acu's bills, reports and other documentation was the same exact telephone number used by the other professional corporations operating at the 455 Ocean Parkway Clinic and registered to the Management Defendants.

141.    In 2013, in an effort to conceal the scheme, City Care Acu was "swapped" out and replaced by yet another professional corporation, LVOV Acupuncture, PC ("LVOV"), also allegedly owned by Kiner.

142.    LVOV Acu took over the same space used by City Care Acu, acquired the equipment used by City Care Acu for free, and succeeded to City Care Acu's patients as well as its employees, including Safir.

143.    During the time period in which the Management Defendants phased out City Care Acu and brought in LVOV Acu, the Management Defendants and Kiner actively billed GEICO double for treatments rendered on the same Insureds on the same dates; submitting the treatments once through City Care and then again through LVOV.

144.    At an examination under oath on November 13, 2013, Kiner gave testimony indicating that all of City Care Acu's and LVOV Acu's patients came from the 455 Ocean Parkway Clinic's front desk.  Kiner also gave testimony indicating that he himself had never rendered acupuncture services at the 455 Ocean Parkway Clinic.

**E.    The Fraudulent Incorporation and Operation of the Physical Therapy Corporation: Oasis PT**

145.    The Management Defendants fraudulent scheme also included physical therapy under the name of Oasis PT, using Endozo as part of the scheme.  Endozo had previously interchangeably performed physical therapy services for some of the professional corporations

illegally owned and controlled by the Management Defendants at the 455 Ocean Parkway Clinic.

146.    The Management Defendants' familiarity with Endozo allowed them to seamlessly expand their fraudulent scheme at the 455 Ocean Parkway Clinic.  To that end, in March 2006, the Management Defendants recruited Endozo who was willing to "sell" her license to the Management Defendants so that they could fraudulently incorporate Oasis PT and use it to submit large-scale fraudulent billing to insurers.

147.    As they had done before, in order to circumvent New York law and to induce the State Education Department to issue a certificate of authority authorizing Oasis PT to operate a physical therapy practice, the Management Defendants entered into a secret scheme with Endozo. In exchange for a designated salary or other form of compensation, in August 2006, Endozo agreed to falsely represent in the certificate of incorporation filed with the Department of Education, and the biennial statements filed thereafter, that she was the true shareholder, director and officer of Oasis PT and that she truly owned, controlled and practiced through the professional corporation. Endozo agreed to the scheme knowing that the professional corporation would be used by the Management Defendants as a vehicle to submit fraudulent billing to insurance companies.

148.    Soon thereafter, Endozo ceded true ownership and control over Oasis PT to the Management Defendants. The Management Defendants caused the professional corporation to begin operating from the 455 Ocean Parkway Clinic, which they controlled.

149.    At the clinic, Safir posed as the office/collections manager for the professional corporation, but, in actuality, controlled and owned the professional corporation, directing the fraudulent services that were performed.

150.    Endozo has never been the true shareholder, director, or officer of Oasis PT and

has never had any true ownership interest in or control over the professional corporation.  True ownership and control over Oasis PT has rested at all times entirely with the Management Defendants, who use the facade of Oasis PT to do indirectly what they are forbidden from doing directly, namely to: (i) employ physicians and other licensed health care professionals; (ii) control their practices; and (iii) charge for and derive an economic benefit from their services.

151.    The Management Defendants, rather than Endozo provided all start-up costs and investment in Oasis PT.  Endozo did not incur any costs to establish Oasis PT's practice, nor did she invest any money in the professional corporation she purportedly owned.

152.    Oasis PT did not advertise or market its services to the general public.

153.    The Management Defendants continually described Oasis PT's practice by non-descript signage to the public, without indicating or advertising the name of Oasis PT or Endozo as the owner, as one would expect if the medical provider was truly owned and controlled by her.

154.    Endozo and Oasis PT relied on referrals from healthcare providers operating out of the 455 Ocean Parkway Clinic that were generated and directed by the Management Defendants.

155.    Further, Oasis PT did not have its own telephone number. The telephone number listed on Oasis PT's bills, reports and other documentation was the same exact telephone number used by the other professional corporations operating at the 455 Ocean Parkway Clinic and registered to the Management Defendants.

156.    In an effort to conceal the scheme, the Management Defendants "closed" Oasis PT and now have Endozo working providing physical therapy at the same location under the name of Jamaica Wellness.

### III.   Endozo's Illegal Self-Referrals To Oasis PT

157.   In addition to selling her medical license to the Management Defendants, Endozo engaged in illegal referrals as part of the fraudulent scheme spearheaded by the Management Defendants.

158.   New York has a statutory prohibition on self-referrals, i.e., referrals to a healthcare provider with which the referring practitioner has a financial relationship. Specifically, Public Health Law § 238-a states:

> a practitioner authorized to order clinical laboratory services, pharmacy services, radiation therapy services, physical therapy services or x-ray or imaging services may not make a referral for such services to a health care provider authorized to provide such services where such practitioner or immediate family member of such practitioner has a financial relationship with such health care provider.

159.   A financial relationship is defined in section 238(3) of the Public Health Law as "an ownership interest, investment interest or compensation arrangement." (emphasis added)

160.   Endozo violated the statutory prohibition against self-referrals.  Endozo was purportedly an employee of BY MD and Parkway Medical, rendering physical therapy to their Insureds.  For these Insureds, Endozo and BY MD and/or Parkway Medical then referred the Insureds to Oasis PT – owned by Endozo – for physical therapy modalities, most notably aqua-jet therapy and physical performance testing.

161.   Oasis PT and Endozo billed for physical therapy services in violation of the "self-referral" laws established under Public Health Law § 238, among others.  Accordingly, GEICO is entitled to recover from Defendants all monies paid by GEICO to Oasis PT and Endozo pursuant to Public Health Law § 238 for any and all services where patients were referred to Oasis PT by Endozo while she was purportedly employed by BY MD and Parkway Medical.

#### IV.     The Defendants' Fraudulent Treatment And Billing Protocol

162.    The PC Defendants, while ostensibly independent entities with individual tax identification numbers, in actuality have been used by the Management Defendants to execute a large-scale, complex fraudulent scheme designed to bill GEICO and the New York automobile insurance industry millions of dollars for medically useless healthcare services – all from a single medical clinic at 455 Ocean Parkway.

163.    The Defendants have conducted their scheme through multiple medical professional corporations using different tax identification numbers to reduce the volume of fraudulent billing submitted through any single entity using any single tax identification number. This scheme allows the Defendants to avoid detection, and thereby perpetuate their fraudulent scheme and increase their ill-gotten gains.

164.    As part of the scheme, Defendants purported to subject the Insureds to a medically unnecessary course of "treatment" that was provided pursuant to a pre-determined, fraudulent protocol designed to maximize the billing that they submitted through the PC Defendants to insurers, including GEICO.    The Defendants purported to provide their pre-determined fraudulent treatment protocol to Insureds without regard for the Insureds' individual symptoms or presentment.

#### A.     The Fraudulent Examinations

165.    Upon presenting at Parkway Medical, BY MD or MK Chiro ("Examination Defendants"), Insureds purportedly received an examination.

166.    Following almost every initial examination, regardless of their individual circumstances or unique presentment, the Insureds were routinely directed to receive other consultations and excessive and/or unnecessary services, including physical therapy, chiropractic,

acupuncture, ROM/Muscle tests, Physical Performance Testing, EMG/NCV tests, and a host of other purported healthcare services, pursuant to the dictates of the Management Defendants.

167.    The Defendants' examinations were fraudulent in that (i) the examinations were medically unnecessary and were performed, to the extent that they were performed at all, pursuant to the Management Defendants' direction and control and (ii) the examinations directed Insureds to receive other consultations, along with excessive and/or unnecessary services, without regard to the actual medical necessity of such services.

**B.      The Fraudulent Computerized Range of Motion and Muscle Tests**

168.    In an attempt to maximize the fraudulent billing that they submitted or caused to be submitted for each Insured, Defendants Parkway Medical, BY MD, and Dr. Geris (collectively the "ROM/MT Defendants") instructed Insureds to undergo one or more rounds of medically useless computerized range of motion and muscle tests.

169.    The charges for the computerized range of motion and muscle tests were fraudulent in that (i) the computerized range of motion and muscle tests were medically unnecessary and performed – to the extent that they were performed at all – pursuant to the Management Defendants' fraudulent treatment protocol and (ii) were designed solely to financially enrich the ROM/MT Defendants

      (i)      <u>Traditional Tests to Evaluate the Human Body's Range of Motion and Muscle Strength</u>

170.    The adult human body is made up of 206 bones joined together at various joints that either are of the fixed, hinged or ball-and-socket variety. The body's hinged joints and ball-and-socket joints facilitate movement, allowing a person to – for example – bend a leg, rotate a shoulder, or move the neck to one side.

171.   The measurement of the capacity of a particular joint to perform its full and proper function represents the joint's "range of motion". Stated in a more illustrative way, range of motion is a measurement of movement around a specific joint.

172.   A traditional, or manual, range of motion test consists of a non-electronic measurement of movement around the joint, in comparison with an unimpaired or "ideal" joint. In a traditional range of motion test, the physician asks the patient to move his or her limbs around the joints at various angles, or the physician moves the joints. The physician then evaluates the patient's range of motion either by visual observation or through the use of a manual inclinometer or a goniometer (i.e., a device used to measure angles).

173.   Similarly, a traditional muscle strength test consists of a non-electronic measurement of muscle strength, which is accomplished by having the patient move his/her body part or extremity in a given direction against resistance applied by the physician. For example, if a physician wanted to measure muscle strength in the muscles surrounding a patient's knee, he or she would apply resistance against the patient's leg while having him/her move the leg up, then apply resistance against the patient's leg while having him/her move the leg down.

174.   Physical examinations performed on patients with soft-tissue trauma necessarily include range of motion and muscle strength tests, inasmuch as these tests provide a baseline for injury assessment and treatment planning. Evaluation of range of motion and muscle strength is a part of initial history and examination and a component of the "hands-on" examination of a trauma patient.

175.   Since range of motion and muscle strength tests are conducted as an element of a soft-tissue trauma patient's initial examination, as well as during any follow-up examinations, the Fee Schedule provides that range of motion and muscle strength tests are to be reimbursed as an

element of the examinations. In other words, healthcare providers in soft tissue cases cannot conduct and bill for an initial examination or follow-up examination, and then bill separately for contemporaneously-provided range of motion and muscle tests.

(ii)    The ROM/MT Defendants' Duplicate Billing for Medically Unnecessary Computerized Range of Motion and Muscle Tests

176.    To the extent that the ROM/MT Defendants actually provided the examinations that are billed to GEICO, the ROM/MT Defendants conducted manual range of motion and manual muscle tests on virtually all Insureds during each examination.

177.    The charges for these manual range of motion and manual muscle tests were part and parcel of the charges that the ROM/MT Defendants routinely submitted for initial examinations under Current Procedural Terminology codes ("CPT Codes") 99241, 99242, 99202, and 99203, and for follow-up examinations under CPT Codes 99212 and 99213.

178.    Despite the fact that Insureds already purportedly have undergone manual range of motion and muscle testing during their examinations, and despite the fact that reimbursement for range of motion and muscle testing already had been paid by GEICO as a component of reimbursement for the examinations, the ROM/MT Defendants systematically billed for, and purported to perform, a series of computerized range of motion and muscle tests on Insureds.

179.    The ROM/MT Defendants often deliberately scheduled separate appointments for computerized range of motion and muscle tests so that they could bill for those procedures separately, without having to include them in the billing for the examinations, as required by the Fee Schedule.

180.    The ROM/MT Defendants purport to provide the computerized range of motion tests by placing a digital inclinometer or goniometer on various parts of the Insureds' bodies while the Insured is asked to attempt various motions and movements. The test is virtually

identical to the manual range of motion testing that is described above and that purportedly is performed during each initial examination and follow-up examination, except that a digital printout is obtained rather than the provider manually documenting the Insured's range of motion.

181.    The information gained through the use of the computerized range of motion and muscle tests is not significantly different from the information obtained through the manual testing that is part and parcel of the Insured's examination. In the relatively minor soft-tissue injuries allegedly sustained by the Insureds, the difference of a few percentage points in the Insured's range of motion reading or pounds of resistance in the Insured's muscle strength testing is meaningless. Indeed, this is evidenced by the fact that the ROM/MT Defendants did not incorporate the results of the computerized range of motion and muscle strength tests into the rehabilitation programs of the Insureds whom they purport to treat.

182.    The computerized range of motion and muscle tests were part and parcel of the ROM/MT Defendants' interrelated fraudulent schemes, inasmuch as the "service" was rendered pursuant to a pre-established protocol that (i) amounts to purposeful and unnecessary duplication of the manual range of motion and muscle strength testing purportedly conducted during the Insured's examinations; (ii) in no way aids in the assessment and treatment of the Insureds; and (iii) was designed solely to financially enrich the ROM/MT Defendants.

> (iii)    The ROM/MT Defendants' Misrepresentations as to the Identity of the Individuals Who Purportedly Performed the Computerized Range of Motion and Muscle Testing

183.    Not only were the ROM/MT Defendants' charges for the computerized range of motion and muscle tests fraudulent because they were medically useless, they also misrepresented the identity of the individuals who performed the tests.

184.    Pursuant to the Fee Schedule, the use of CPT Codes 95831, 95833, or 95851 represents that the underlying service actually was performed by a physician or other licensed healthcare provider, and all of the ROM/MT Defendants' charges for computerized range of motion and muscle tests represented that either Dr. Geris, Endozo, or some other licensed professional performed the underlying services.

185.    However, to the extent that the ROM/MT Defendants provided computerized range of motion and muscle tests in the first instance, they were performed by unlicensed technicians, rather than by physicians or other licensed healthcare providers.

(iv)    The ROM/MT Defendants' Fraudulent Misrepresentations as to the Existence of Written, Interpretive Reports Regarding the Computerized Range of Motion and Muscle Tests

186.    Not only were the ROM/MT Defendants' charges for the computerized range of motion and muscle tests fraudulent because the tests were medically unnecessary and the billing misrepresented the identity of the treating providers, the charges also were fraudulent because they falsely represented that the ROM/MT Defendants prepared written reports interpreting the test data.

187.    Pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized range of motion testing using CPT Code 95851, the provider represents that it has prepared a written report interpreting the data obtained from the test.

188.    Likewise, pursuant to the Fee Schedule, when a healthcare provider submits a charge for computerized muscle testing using CPT Codes 95831 or 95833, the provider represents that it has prepared a written report interpreting the data obtained from the test.

189.    Though the ROM/MT Defendants routinely submitted billing for the computerized range of motion and muscle tests using CPT Codes 95851, 95831, and 95833, no

physician or licensed professional associated with the ROM/MT Defendants ever prepared any written report interpreting the data obtained from the tests.

190.    No physician or licensed professional associated with the ROM/MT Defendants prepared any written report interpreting the data obtained from the tests because the tests were not meant to have any impact whatsoever on any Insured's course of treatment. Rather, the tests were provided – to the extent that they were provided at all – as part of the Defendants' pre-determined fraudulent treatment protocol, and were designed solely to financially enrich the Defendants at the expense of GEICO and other insurers.

**C.      The Fraudulent EMG/NCV and SSEP Electrodiagnostic Testing**

191.    Based upon the fraudulent, pre-determined "diagnoses" that the Defendants provided during the examinations, Defendants Parkway Medical, BY MD, and Dr. Geris (collectively the "EDX Defendants") purported to subject Insureds to medically unnecessary electromyography ("EMG") tests, nerve conduction velocity ("NCV") tests, and somatosensory evoked potential ("SSEP") tests (collectively the "electrodiagnostic" or "EDX" tests).

192.    Like the EDX Defendants' charges for other Fraudulent Services they purported to provide, their charges for the EDX tests were fraudulent in that the EDX tests were medically unnecessary and were performed – to the extent that they were performed at all – pursuant to the Management Defendants directive.

(i)      The Human Nervous System and Electrodiagnostic Testing

193.    The human nervous system is composed of the brain, spinal cord, spinal nerve roots, and peripheral nerves that extend throughout the body, extending through the arms and legs and into the hands and feet. Two primary functions of the nervous system are to collect and relay sensory information through the nerve pathways into the spinal cord and up to the brain,

and to transmit signals from the brain into the spinal cord and through the peripheral nerves to initiate muscle activity throughout the body.

194.    The nerves responsible for collecting and relaying sensory information to the brain are called sensory nerves, and the nerves responsible for transmitting signals from the brain to initiate muscle activity throughout the body are called motor nerves. Peripheral nerves consist of both sensory and motor nerves. They carry electrical impulses throughout the body, to and from the spinal cord and extending, for example, into the hands and feet through the arms and legs.

195.    The segments of nerves closest to the spine and through which impulses travel between the peripheral nerves and the spinal cord are called the nerve roots. A "pinched" nerve root is called a radiculopathy, and can cause various symptoms and signs including pain, altered sensation, atrophy, loss of muscle power, and alteration of reflexes.

196.    EMGs, NCVs, and SSEPs are forms of electrodiagnostic tests, and purportedly are provided by the EDX Defendants because they are medically necessary to determine whether the Insureds have radiculopathies.

197.    The American Association of Neuromuscular and Electrodiagnostic Medicine ("AANEM") (previously known as the American Association of Electrodiagnostic Medicine), which consists of thousands of neurologists and physiatrists and is dedicated solely to the scientific advancement of neuromuscular medicine, has adopted a recommended policy (the "Recommended Policy") regarding the optimal use of electrodiagnostic medicine in the diagnosis of various forms of neuropathies, including radiculopathies. The Recommended Policy accurately reflects the demonstrated utility of various forms of electrodiagnostic tests, and has been endorsed by two other premier professional medical organizations, the American Academy of Neurology and the American Academy of Physical Medicine and Rehabilitation.

43

198.   According to the Recommended Policy, the maximum number of NCVs necessary to diagnose a radiculopathy in 90 percent of all patients is: (i) NCVs of three motor nerves; (ii) NCVs of two sensory nerves; and (iii) two H-reflex studies.

199.   According to the Recommended Policy, the maximum number of EMGs necessary to diagnose a radiculopathy in 90 percent of all patients is EMGs of two limbs.

(ii)   The Fraudulent NCVs

200.   As part of their fraudulent treatment and billing protocol, the EDX Defendants purported to provide medically useless NCVs to Insureds.

201.   NCVs are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with an electrical impulse to cause the nerve to depolarize. The depolarization, or "firing," of the nerve is transmitted, measured and recorded with electrodes attached to the surface of the skin. An EMG/NCV machine then documents the timing of the nerve response (the "latency"), the magnitude of the response (the "amplitude"), and the speed at which the nerve conducts the impulse over a measured distance (the "conduction velocity"). In addition, the EMG/NCV machine displays the changes in amplitude over time as a "waveform". The amplitude, latency, and shape of the response then should be compared with well-defined normal values to identify the existence, nature, extent, and specific location of any abnormalities in the sensory and motor nerve fibers.

202.   There are several motor and sensory peripheral nerves in the arms and legs that can be tested with NCVs. Moreover, most of these peripheral nerves have both sensory and motor nerve fibers, either or both of which can be tested with NCVs.

203.   F-wave and H-reflex studies are additional types of NCV tests that may be conducted in addition to the sensory and motor nerve NCV studies. F-wave and H-reflex studies

generally are used to derive the time required for an electrical impulse to travel from a stimulus site on a nerve in the peripheral part of a limb, up to the spinal cord, and then back again. In contrast, the motor and sensory NCV studies are designed to evaluate nerve conduction in nerves within a limb.

204.    The decision of which peripheral nerves to test in each limb and whether to test the sensory fibers, motor fibers, or both sensory and motor fibers in any such peripheral nerve must be tailored to each patient's unique circumstances. In a legitimate clinical setting, this decision is determined based upon a history and physical examination of the individual patient, as well as the real-time results obtained as the NCVs are performed on particular peripheral nerves and their sensory and/or motor fibers. As a result, the nature and number of the peripheral nerves and the type of nerve fibers tested with NCVs should vary from patient-to-patient. Likewise, the decision regarding whether to conduct F-wave or H-reflex studies should vary from patient-to-patient according to the individual patient's clinical presentation and the evolving electrodiagnostic study results.

205.    Though the EDX Defendants purported to provide NCV tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, the EDX Defendants did not perform adequate neurological history and examination to create a foundation for the EDX testing. In actuality, the EDX Defendants provided NCV tests to Insureds – to the extent that they provided them at all – as part of the Management Defendants' pre-determined, fraudulent treatment protocol designed to maximize the billing that they could submit for each Insured.

206.    The EDX Defendants did not tailor the NCVs that they performed to the unique circumstances of each individual Insured. Instead, they applied a fraudulent "protocol" and purported to perform NCVs on the same peripheral nerves and nerve functions for each Insured.

207.    Furthermore, though the maximum number of NCVs necessary to diagnose a radiculopathy in 90 percent of all patients is (i) NCVs of three motor nerves; (ii) NCVs of two sensory nerves; and (iii) two H-reflex studies, the Defendants routinely exceeded this maximum by an order of magnitude in order to increase the fraudulent billing they submitted to GEICO. Specifically, the EDX Defendants in many cases purported to perform: (i) NCVs of at least eight motor nerves; (ii) NCVs of at least 10 sensory nerves; as well as (iii) two H-reflex studies.

208.    Assuming that all other conditions of coverage are satisfied, the Fee Schedule permits physicians in the metropolitan New York area to submit maximum charges of, among other things: (i) $106.47 under CPT Code 95904 for each sensory nerve in any limb on which an NCV is performed; (ii) $166.47 under CPT Code 95903 for each motor nerve with F-wave in any limb on which an NCV is performed; and (iii) $119.99 under CPT Code 95934 for each H-Reflex test that is performed on nerves of the lower extremity. The EDX Defendants routinely purported to test far more nerves than recommended by the Recommended Policy so as to maximize the fraudulent charges that they submitted to GEICO and other insurers.

(iii)    The Fraudulent EMGs

209.    The EDX Defendants also purported to provide medically unnecessary EMGs to Insureds, as part of Defendants' fraudulent treatment and billing protocol.

210.    EMGs involve the insertion of a needle into various muscles in the spinal area ("paraspinal muscles") and in the arms and/or legs to measure electrical activity in each such muscle. The sound and appearance of the electrical activity in each muscle are compared with well-defined norms to identify the existence, nature, extent, and specific location of any abnormalities in the nerve roots, peripheral nerves, and muscles.

211.     Though, in many cases, the EDX Defendants purported to provide EMG tests to Insureds in order to determine whether the Insureds suffered from radiculopathies, the EDX Defendants did not perform adequate neurological histories and examinations to create a foundation for the EDX testing. For instance, as the history and examination reports definitively show, the EDX Defendants almost never performed motor exams on the Insureds who went on to receive (purportedly) EMG tests. Motor exams, however, are a foundational requirement for EMG tests, and they must be performed in order for an EMG test to be medically necessary. This failure to perform adequate neurological histories and examinations is in line with the Management Defendants' agenda of providing (purportedly) EMG tests to Insureds as part of the Management-Defendant-created pre-determined, fraudulent treatment protocol designed to maximize the billing submitted for each Insured.

212.     The EDX Defendants did not tailor the performance of EMGs to the unique circumstances of each patient. Instead, they routinely purported to test the same muscles in the same limbs, without regard for individual patient presentation.

213.     Furthermore, even if there were any need for any of these EMGs, the nature and number of the EMGs that the EDX Defendants generally performed grossly exceeded the maximum number of such tests – i.e., EMGs of two limbs – that should be necessary in at least 90 percent of all patients with a suspected diagnosis of radiculopathy.

214.     As part of their scheme, the Defendants typically submitted separate two-limb EMG charges on two separate bills, exceeding the maximum number of such tests, but concealing the fact that they were providing four-limb EMGs to Insureds in contravention of the Recommended Policy.

215.    The Defendants scheme also fraudulently permitted Defendants to maximize their EMG billing. More specifically, if all other conditions of coverage are satisfied, the Fee Schedule permits lawfully licensed healthcare professionals in the metropolitan New York area to submit maximum EMG charges of: (i) $185.73 under CPT Code 95860 if an EMG is performed on at least one extremity; (ii) $241.50 under CPT Code 95861 if an EMG is performed on at least two extremities; (iii) $314.34 under CPT Code 95863 if an EMG is performed on at least three extremities; and (iv) $408.64 under CPT Code 95864 if an EMG is performed on at least four extremities

216.    Typically, the EDX Defendants unbundled their billing into two separate two-limb EMG charges of $241.50 per Insured, rather than a single four-limb EMG charge of $408.64.

217.    Thus, instead of charging $408.64 per Insured for a single, medically useless four-limb EMG, the EDX Defendants typically submitted total charges of $483.00 for two medically useless two-limb EMGs, resulting in an overcharge of almost $75.00 for many Insureds who purportedly received the medically unnecessary EMGs.

(iv)    The Fraudulent SSEP Test Charges

218.    SSEP tests are non-invasive tests in which peripheral nerves in the arms and legs are stimulated with electrical currents. The potentials – wave forms – evoked by this electrical stimulation then are recorded by electrodes overlying the spine and attached to the scalp.

219.    SSEP tests are medically necessary only in limited instances in which an individual suffers from severe spinal impairment, and – in such cases – solely for the purpose of determining where within the spinal canal the patient requires decompression surgery, or as an intra-operative guide during the course of scoliosis surgery upon children, and spine surgery that

might comprise the spinal cord. It is also considered medically necessary in the diagnosis of suspected multiple scoliosis.

220.  The Recommended Policy does not recommend SSEP tests for use in diagnosing radiculopathies. Consistent with the Recommended Policy, the New York State Workers' Compensation Board, Neck Injury Medical Treatment Guidelines also establish that SSEPs are not useful in diagnosing radiculopathies.

221.  Even so, BY MD purported to provide SSEPs to Insureds, supposedly for use in diagnosing radiculopathies. BY MD then billed the SSEP tests to GEICO under CPT Codes 95925 and 95926, typically resulting in charges of more than $600.00 for each Insured on whom the SSEP tests purportedly were performed.

222.  Even if BY MD's SSEPs had any medical utility in diagnosing radiculopathies, they were medically unnecessary and abusive, particularly given that BY MD purported to perform NCVs and EMGs on the same patients. These NCVs and EMGs, standing alone, provided a more than sufficient basis for a radiculopathy diagnosis, assuming such a diagnosis was even necessary in the first place.

223.  Furthermore, even if SSEPs had any clinical utility in diagnosing radiculopathies as used by BY MD– which they do not – the decision whether to use them to test the nerves running from the arms or legs to the brain should be tailored to each patient's unique circumstances. As a result, the SSEPs performed should vary from patient-to-patient. BY MD did not tailor the SSEPs that they purported to provide to the unique circumstance of any Insured. Instead, when BY MD purported to provide SSEPS, it virtually always purported to treat the same nerves running from both the arms and the legs of each Insured.

49

224.    Moreover, on numerous occasions, BY MD and Parkway Medical charged GEICO for SSEP tests that did not even record the wave forms of the Insureds who purportedly received the tests. Rather, BY MD and Parkway Medical actually recorded extraneous alternating currents within the environment of the laboratory and then interpreted those extraneous currents as coming from the Insureds themselves. In other words, BY MD and Parkway Medical did not interpret any human biological response to electrical stimulation – further demonstrating that the tests were worthless; were performed only to maximize the billing that could be generated; and were directed by the Management Defendants.

(v)    The Failure of MK Chiro to Perform NCV Tests Together With EMG Tests

225.    MK Chiro purported to perform NCV tests on numerous Insureds, justifying the use of the NCV tests by claiming that they were necessary to diagnose suspected radiculopathies in the Insureds that MK Chiro purported to treat.

226.    In instances of suspected radiculopathy, where NCVs and EMGs are necessary to diagnose nerve damage, they should be performed together. According to the AANEM's Recommended Policy, both EMG and NCV tests normally are required for a clinical diagnosis of peripheral nervous system disorders. As the Recommended Policy states:

> Radiculopathies cannot be diagnosed by NCS [NCV] alone; needle EMG must be performed to confirm a radiculopathy. Therefore, these studies should be performed together by one physician supervising and/or performing all aspects of the study.
> …
>
> The [electrodiagnostic] laboratory must have the ability to perform needle EMGs. NCSs [NCVs] should not be performed without needle EMG except in unique circumstances." Id.

227.    MK Chiro failed to comply with the Recommended Policy.

228.    Indeed, even though MK Chiro purports to subject numerous Insureds to NCV tests, the professional corporation has not once performed an EMG test, thus rendering any NCV tests actually performed medically unnecessary and not reimbursable under the No-Fault Law.

**E.    The Fraudulent Use of, and Billing for, CPT Testing**

229.    Defendants, using MK Chiro (the "CPT Defendant"), furthered their scheme by billing for Neurometer tests, also known as Current Perception Threshold Tests ("CPT Test"). The CPT Tests were medically unnecessary as they were rendered pursuant to the pre-determined protocol directed by the Management Defendants and conducted solely to enrich the Defendants. Additionally, in an attempt to conceal the nature of the testing performed by the CPT Defendant, the CPT Defendant would bill for the CPT Tests under a Fee Schedule Code that misrepresented the actual test performed.

230.    CPT Tests purport to diagnose abnormalities only in the sensory nerves and sensory nerve roots. They do not, and cannot, provide any diagnostic information regarding the motor nerves and motor nerve roots. CPT Tests are performed by administering electrical current at specific skin sites to evoke a conscious response to the sensory stimulus in the arms, legs, hands, feet and face. The intensity of the electrical current is increased until the patient states that he perceives a sensation from the stimulus caused by the current. "Findings" are then made by comparing the minimum intensity of electrical current required for the patient to announce that he perceives some sensation from it (this minimum intensity is referred to as the patient's "current perception threshold") with purported normal ranges. If the patient's "current perception threshold" is greater than the purported normal range of intensity required to evoke a sensation, it allegedly indicates that the patient has decreased function of the sensory nerves. If the intensity of the electrical current required for the patient to announce that he perceives a sensation is less than

the supposed normal range of intensity to evoke a sensation, it allegedly indicates that the patient's nerves are in a hypersensitive state.

231.    The ability of CPT Tests to diagnose the existence, nature, severity or specific location of any abnormalities in the sensory nerves or any of the nerve fibers of which they are comprised remains unproven. Even if CPT Tests could produce any valid diagnostic information regarding the sensory nerve fibers: (a) there is no reliable evidence to prove that any such information would have any value beyond that which could be gleaned from a routine history and neurological examination of the patient; (b) there is no reliable evidence to prove that any such information would indicate the nature or extent of any abnormality in the sensory nerves or sensory nerve roots; (c) there is no reliable evidence to prove that any such information would indicate the specific location of the abnormality along the sensory nerve pathways; (d) the CPT Tests do not provide any information regarding the motor nerves or motor nerve roots which are at least as likely as the sensory nerves or sensory nerve roots to be injured in an automobile accident; and (e) there would be no diagnostic advantage to using the CPT Tests to obtain information regarding the sensory nerve fibers where patients can also be subjected at the same time to EMG/NCVs, or MRIs.

232.    In 2002, the Centers for Medicare and Medicaid Services ("CMS") reviewed the efficacy of CPT Tests and issued a national coverage determination concluding that CPT Tests are not medically reasonable and necessary for diagnosing sensory neuropathies (i.e., abnormalities in the sensory nerves) and are therefore not compensable.

233.    In addition, the American Association of Electrodiagnostic Medicine ("AAEM") also concluded that CPT testing is not medically necessary for diagnosing sensory neuropathies. Like CMS, the AAEM concluded that there is no reliable evidence: (a) to prove any of the

supposed normal ranges of current perception threshold against which a patient's CPT Test results can be measured to arrive at a legitimate finding of normal or abnormal; (b) to find the existence of hypoesthetic or hyperesthetic conditions based upon allegedly abnormal CPT Test results; (c) to measure the severity of any such condition based upon the degree of abnormality; (d) to identify the cause of any such condition; or (e) to identify the specific location of any such condition.

234.    Consistent with the conclusion that there is no reliable evidence to support the validity of CPT Tests, the American Medical Association's Physicians' Current Procedural Terminology handbook, which establishes thousands of procedure codes, i.e., CPT Codes for physicians to use in describing their services for billing purposes, does not recognize a CPT Code for CPT Tests.

235.    The NF-3 Forms for each CPT Test claimed to have been performed and interpreted by the CPT Defendants used CPT Code 95904 and falsely described the service for which payment is sought. CPT Code 95904 represents that the tests for which payments are being sought are NCVs of the sensory nerves. The CPT Defendant's use of this CPT Code is false and misleading because the tests for which payments are sought are CPT Tests not NCVs. Because the American Medical Association's Physicians' Current Procedural Terminology handbook does not recognize a CPT Code for CPT Tests, the CPT Defendants used CPT Code 95904 in an attempt to mask the fact that non-reimbursable CPT Tests are being rendered and avoid the fact that the Fee Schedule does not establish a specific charge permissible for CPT Tests, all in an effort to obtain monies for GEICO they were never entitled to.

**F.     The Unlawful Manipulation of the Fee Schedule For Physical Therapy, including Aqua-Jet Therapy and Infrared Therapy**

236.    The Defendants, using Oasis PT, Parkway Medical, BY MD, City Care Acu, Endozo, Dr. Geris, and Kiner, masterminded two other fraudulent efforts to improperly maximize billing submitted to GEICO by circumventing the 8 allowable units for physical therapy per day under the Fee Schedule. In the first instance, Oasis PT would provide Insureds with aqua-jet therapy performed by a physical therapist on the same day physical therapy was performed by the same physical therapist under the name of another professional corporation: either Parkway Medical and/or BY MD. In a second instance, City Care Acu would bill for infrared therapy treatment purportedly provided to Insureds on the same day Parkway Medical billed for physical therapy allegedly provided to the Insureds.

237.    The Physical Medicine section of the Fee Schedule establishes ground rules that healthcare providers and insurers are required to follow when determining the permissible charge or reimbursement for a specific service. As it relates to physical therapy services and the scope of services relevant to the present dispute, Ground Rule 11 states:

> When multiple physical medicine procedures and/or modalities are performed on the same day, reimbursement is limited to 8.0 units or the amount billed, whichever is less. The following codes represent the physical medicine procedures and modalities subject to this rule:

| 97010 | 97012 | 97014 | 97016 | 97018 | 97022 |
|-------|-------|-------|-------|-------|-------|
| 97024 | 97026 | 97028 | 97032 | 97033 | 97034 |
| 97035 | 97036 | 97039 | 97110 | 97112 | 97113 |
| 97116 | 97124 | 97139 | 97140 | 97150 | 97530 |
| 97535 | 97537 | 97542 | 97760 | 97661 | 97662 |

238.     Pursuant to the Fee Schedule, the majority of the above referenced CPT Codes and corresponding physical procedures are assigned a relative value unit. Therefore, a healthcare provider that provides physical therapy to an Insured cannot bill for and receive payment for any combination of the above referenced physical therapy procedures performed on the same patient on the same day if the aggregate value of all of those procedures exceeds 8.0 units.

239.     In support of its charges, Oasis PT has submitted documentation attempting to establish that the purpose and characteristics of the aqua-jet therapy fit within the regimen of physical therapy otherwise provided. For example, the documentation submitted by Oasis PT states that the aqua-jet procedure: (i) is a therapeutic modality, (ii) stimulates circulation, (iii) increases flexibility, (iv) increases range of motion, and (v) is an adjunct to the manual treatment regime currently provided to the patients. While aqua-jet therapy purports to be a form of physical therapy (specifically hydrotherapy), the American Medical Association does not recognize it as an actual medical procedure – as a result, there is no recognized CPT Code for the performance of aqua-jet therapy. That is not surprising since aqua-jet therapy, in the form that it is employed by Oasis PT is no different than the type of massage therapy services which are found at the local mall or shopping center and generally cost in the range of $5.00 to $10.00 a session.

240.     In order to effectuate the scheme, Parkway Medical and/or BY MD rendered basic physical therapy services to Insureds on the one hand while on the other hand, Oasis PT rendered another form of purported physical therapy (aqua-jet therapy services) to the same Insureds on the same day. Despite the appearance of two separate professional corporations providing services to the Insureds on the same day, the fact is that the same personnel were used to provide the services to the Insureds on the same day. The billing for those services, however, was split

among two professional corporations to conceal the fact that the same personnel were billing for excessive physical therapy services to Insureds on the same day in circumvention of the limitations in the Fee Schedule on the billing for physical therapy services.

241.   For example, Endozo performed basic physical therapy services on behalf of Parkway Medical and/or BY MD using CPT Codes 97010 (hot/cold packs), 97014 (electrical stimulation) and 97124 (massage therapy). Though the cumulative relative value of these services based on the Fee Schedule is 7.65, every patient who received these services from Parkway Medical and/or BY MD was then referred to Oasis PT for aqua-jet therapy that was rendered to these patients on the very same day.

242.   The billing provided and documentation submitted by Oasis PT represented that the aqua-jet therapy was rendered most often using Treatment Codes 97039, a "By Report" procedure having no relative value, and 97799, an "unlisted physical medicine/rehabilitation service or procedure" having no relative value.

243.   Oasis PT, however, intentionally submitted charges for aqua-jet therapy under CPT Codes having no relative value so that they can deceive insurers into paying for aqua-jet therapy even though the patients already received physical therapy services on the same day (i.e., CPT Codes 97010, 97014, and 97124). Although there are no relative values for the aqua-jet therapy performed by Oasis PT, they would not be entitled to the entire amounts billed per procedure for the aqua-jet therapy (i.e., $61.10 to $85.00 billed per procedure).

244.   In each instance in which Oasis PT submitted charges for the aqua-jet procedure, reimbursement is limited to the value of the service performed which is determined by the nature, extent and the need for the procedure or service, the time, the skill, and the equipment necessary

to perform the procedure. Oasis PT, however, knew that the procedure was nothing more than an extension of basic physical therapy, at best.

245.    The scheme is simple yet complex at the same time: perform physical therapy service at Parkway Medical and/or BY MD and then use the same personnel (i.e. the same physical therapist) and bill the aqua-jet therapy service under an unlisted code and through a separate entity (Oasis PT) to circumvent the 8 unit per day limit. As a further part of the scheme, Parkway Medical and/or BY MD and Oasis PT knowingly submitted their bills separately in an effort to confuse GEICO into issuing reimbursement for both the physical therapy and the aqua-jet therapy despite the fact that one of the modalities of treatment is technically beyond the maximum daily allowable reimbursement.

246.    The second instance of circumventing the fee schedule masterminded by the Management Defendants involved City Care Acupuncture providing Insureds with infrared therapy treatment on the same day physical therapy was performed by Parkway Medical, again in an effort to circumvent the allowable units for physical therapy per day.

247.    In order to effectuate this part of the scheme, Parkway Medical rendered basic physical therapy services to Insureds on the one hand while on the other hand, City Care Acu rendered another form of purported physical therapy (infrared therapy services) to the same Insureds on the same day. Yet again, despite the appearance of two separate professional corporations providing services to the Insureds on the same day, the billing for those services is split among two professional corporations to circumvent the limitations on the billing for physical therapy services.

248.    Here, in many cases, Parkway Medical performed physical therapy on their Insureds – which included CPT Codes 97010, 97014, 97124 – that was billed under the Insureds

respective names which have a cumulative relative value based on the Fee Schedule of 7.65.

249.    Nevertheless, City Care Acu then rendered infrared therapy treatment to the same Insureds on the same day and billed GEICO utilizing CPT Code 97026 ($21.46 per patient per session) which has a cumulative relative value based on the Fee Schedule of 2.54. Thus, the cumulative relative value of the physical therapy and infrared treatment per day per patient is 10.19, consequently allowing City Care Acu and Parkway Medical to obtain additional monies above and beyond the 8.0 allowable units of physical therapy they would be entitled to for each Insured per day.

250.    Despite rendering just another mode of physical therapy, City Care Acu knowingly submitted charges to GEICO so as to create an avenue by which it could bill GEICO fees to which it was not entitled. In addition, City Care Acu and Parkway Medical submitted their bills separately in an effort to confuse GEICO into issuing reimbursement for both the physical therapy and the infrared therapy treatment despite the fact that one of the modalities of treatment is technically beyond the maximum daily allowable reimbursement.

G.    **The Fraudulent Acupuncture "Treatments" Provided Through City Care Acu**

251.    Consistent with the excessive and fraudulent provision of healthcare services at the 455 Ocean Parkway Clinic, the Defendants here purported to provide acupuncture services under the name of City Care Acu but did so solely to maximize the billing submitted to insurers, without regard to the medical necessity of the services or the requirements for proper billing under New York's No-Fault Laws - - and pursuant to the directives of the Management Defendants.

252.    In furtherance of the Defendants' fraudulent scheme, every Insured who was referred to City Care Acu was subjected to acupuncture treatments that were provided – to the

extent that they were provided at all – pursuant to a pre-determined, fraudulent protocol, without regard to patient care. This pre-determined, fraudulent protocol involved exploiting the patients for the financial gain of the Defendants and performing, or purporting to perform, excessive and medically unnecessary fraudulent acupuncture services not warranted by the patients' conditions in order to inflate the billing and maximize the profits reaped by the Defendants.

253.   Acupuncture is predicated upon the theory that there are twelve main meridians ("the Meridians") in the human body through which energy flows. Every individual has a unique energy flow ("Chi") or, more particularly, unique patterns of underlying strengths and weaknesses in the flow of Chi that are impacted differently from trauma. When an individual's unique Chi becomes disrupted or imbalanced for any reason (such as trauma), needles can be inserted or pressure can be applied to very specific points ("Acupuncture Points") along the Meridians to remove the disruption or imbalance and restore the patient's unique Chi.

254.   The goal of any legitimate acupuncture treatment is to effectively treat and benefit the patient by restoring his or her unique Chi, relieving his or her symptoms, and returning him or her to normal activity. Since every individual has a unique Chi, acupuncture treatment should be individualized. In fact, the differences in each individual's unique patterns of underlying strengths and weaknesses in the flow of Chi should be reflected in different treatment strategies.

255.   Moreover, any legitimate acupuncture treatment requires a continuous assessment of the patient's condition and energy flow, as well as the therapeutic effect of previous treatments. Therefore, adjustments in treatment should be made as treatment progresses over time in order to improve the therapeutic effectiveness of each treatment, and eventually to return the patient to maximum health.

256.   Any legitimate acupuncture treatment also requires meaningful, genuine, and individualized documentation of the: (i) physical examination; (ii) diagnosis; (iii) treatment plan; (iv) results of each session; and (v) the patient's progress throughout the course of treatment.

257.   In contrast to legitimate acupuncture treatment, the patients of City Care Acu were treated with repetitive and virtually identical point prescriptions, without regard to any necessary individual treatment strategies, without regard to any necessary adjustments in treatment as treatment progresses over time, and without meaningful, genuine, and individualized documentation.

258.   At best, the purported "acupuncture" services provided City Care Acu consisted of inserting needles into Insureds in an assembly-line fashion, and reflect a predetermined protocol designed to enrich the Defendants through the submission of fraudulent charges to GEICO and other insurers.

259.   The New York Workers' Compensation Fee Schedule used for No-Fault billing sets forth the billing codes and requirements for billing acupuncture services to insurers, as follows:

| | |
|---|---|
| 97810 | Acupuncture, one or more needles, without electrical stimulation; initial 15 minutes of personal one-on-one contact with the patient |
| 97811 | without electrical stimulation, each additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s) (List separately in addition to code for primary procedure) |
| 97813 | with electrical stimulation, initial 15 minutes of personal one-on-one contact with the patient |
| 97814 | with electrical stimulation, each additional 15 minutes of personal one-on-one contact with the patient, with re-insertion of needle(s) (List separately in addition to code for primary procedure) |

260. The purported acupuncture treatment described in the treatment notes for City Care Acu in almost all cases fails to justify the billing submitted for multiple units of personal, one-on-one contact.

261. City Care Acu provides acupuncture treatment in the exact same fraudulent fashion, almost always billing GEICO for two acupuncture treatment units, first under CPT Code 97810 and then under CPT Code 97811.

262. City Care Acu inserts needles into areas of the patient's body where the patient supposedly feels pain. This comprises the first acupuncture treatment unit and is billed to GEICO under CPT Code 97810.

263. After the first acupuncture treatment unit is complete, City Care Acu then insert a new set of needles into the patient's body *near* the areas that had already been needled in the first acupuncture treatment unit. This comprises the second acupuncture treatment unit and is billed to GEICO under CPT Code 97811.

264. The second acupuncture treatment unit is fraudulent because the areas of the body in which the needles are inserted during the second acupuncture treatment unit should have been needled during the first acupuncture treatment unit. The Defendants, however, split up the needle insertions into two units so that they could increase the dollar amount charged to insurance companies, including GEICO.

265. In addition to billing GEICO for fraudulent acupuncture treatment, on many occasions, City Care Acu fraudulently billed GEICO for initial examinations under CPT Code 99242.

266. These charges were fraudulent because they misrepresent the nature of the underlying service. According to the Fee Schedule, the use of CPT Code 99242 represents that

the acupuncturist has performed a consultation at the request of another physician or other appropriate source.

267. City Care Acu did not provide their initial examinations – to the extent that they were provided at all – at the request of any other physicians or other appropriate sources. Rather, to the extent that the initial examinations were performed in the first instance, they were performed solely as part of the Defendants' fraudulent treatment protocol.

268. Furthermore, the use of CPT Code 99242 by City Care Acu represents that the acupuncturists who purportedly conducted the consultations submitted a written consultation report to the physicians or other appropriate sources who purportedly requested the consultations in the first instance.

269. Though City Care Acu routinely billed for the initial examinations under CPT Code 99242, the acupuncturists who purportedly conducted the examinations never submitted any written consultation report to any physician or other referring healthcare provider, because the initial examinations were not conducted at the request of any referring physician or healthcare provider.

**V. The Fraudulent NF-3 Forms Submitted To GEICO**

270. To support the fraudulent charges, statutorily prescribed claim forms for No-Fault Benefits (i.e., NF-3 Forms) consistently have been submitted to GEICO by and on behalf of the Defendants seeking payment for services for which the PC Defendants are ineligible to receive payment.

271. The NF-3 forms submitted to GEICO by and on behalf of the PC Defendants are false and misleading in the following material respects:

     (i) The NF-3 forms uniformly misrepresent to GEICO that the PC Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits

pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). The PC Defendants were not properly licensed in that they were professional healthcare corporations that were fraudulently incorporated and have been owned and controlled by the Management Defendants, who are not licensed professionals.

(ii)   The NF-3 forms uniformly misrepresent to GEICO that the PC Defendants were lawfully licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). The PC Defendants were not properly licensed in that they were professional healthcare corporations that engaged in unlawful fee splitting with the Management Defendants, who are not licensed professionals.

(iii)   The NF-3 forms uniformly misrepresent to GEICO that services provided by the PC Defendants were medically necessary and that the services were ordered and performed in accordance with the requirements set forth in the Fee Schedule, and therefore the PC Defendants were eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12). The services rendered by the PC Defendants were not medically necessary and/or were not ordered or billed in accordance with the requirements set forth in the Fee Schedule, and were provided pursuant to a pre-determined treatment protocol, making the PC Defendants ineligible to receive reimbursement for those services under the No-Fault Law.

(iv)   The NF-3 forms uniformly misrepresent to GEICO that Oasis PT is eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1). Oasis PT is not entitled to seek or pursue collection of No-Fault Benefits because Endozo and Oasis PT engaged in illegal self-referrals in violation of New York law.

## VI.   Defendants' Fraudulent Concealment And GEICO's Justifiable Reliance

272.   The Defendants legally and ethically are obligated to act honestly and with integrity in connection with the billing that they submit, or caused to be submitted, to GEICO.

273.   To induce GEICO to promptly pay the fraudulent charges, the Defendants systematically have concealed their fraud and have gone to great lengths to accomplish this concealment.

274.   Specifically, the Defendants knowingly misrepresented and concealed facts

related to the PC Defendants in an effort to prevent discovery that the professional corporations are unlawfully incorporated, owned and controlled by unlicensed laypersons and engage in fee splitting, and therefore are ineligible to bill for or collect No-Fault Benefits. For example, the Defendants misrepresented the Nominal Owner Defendants' ownership of and control over the PC Defendants in filings with the New York State Department of Education, so as to induce the New York State Department of Education to issue the licenses required to permit healthcare services to be practiced through the PC Defendants. Additionally, the Management Defendants entered into financial and purported billing/collection arrangements with the PC Defendants that were designed to, and did, conceal their true ownership of and control over the PC Defendants.

275.    Likewise, in every bill that the Defendants submitted or caused to be submitted to GEICO, the Defendants uniformly misrepresented that the PC Defendants were properly incorporated, lawfully licensed, and eligible to bill for and collect No-Fault Benefits, when in fact they were not.

276.    Furthermore, the Defendants knowingly misrepresented and concealed facts in order to prevent GEICO from discovering that the services billed through the PC Defendants were medically unnecessary and/or were not ordered and billed in accordance with the Fee Schedule, and were performed pursuant to a pre-determined protocol designed to maximize the charges that can be submitted.

277.    Furthermore, in bills that Oasis PT submitted or caused to be submitted, the Defendants uniformly misrepresented that the Insured was properly referred for aqua-jet therapy and physical therapy services, when in fact Endozo actually referred patients from other professional corporations in which she was identified as an employee, most notably Parkway Medical and BY MD.

278.    The Defendants have hired law firms to pursue collection of the fraudulent charges from GEICO and other insurers. These law firms routinely file expensive and time-consuming litigation against GEICO and other insurers if the charges are not promptly paid in full.

279.    GEICO is under statutory and contractual obligations to promptly and fairly process claims within 30 days. The facially-valid documents submitted to GEICO in support of the fraudulent charges at issue, combined with the material misrepresentations described above, were designed to and did cause GEICO to rely upon them. As a result, GEICO has incurred damages of more than $1.4 million based upon the fraudulent charges representing payments made by GEICO.

280.    GEICO maintains standard office practices and procedures that are designed to and do ensure that No-Fault claim denial forms or requests for additional verification of No-Fault claims are properly addressed and mailed in a timely manner in accordance with the No-Fault Laws.

281.    In accordance with the No-Fault Laws, and GEICO's standard office practices and procedures, GEICO either: (i) timely denied the pending claims for No-Fault Benefits submitted through the PC Defendants; (ii) timely issued requests for additional verification with respect to all of the pending claims for No-Fault Benefits submitted through the PC Defendants, yet failed to obtain compliance with the request for additional verification; or (iii) the time in which to deny the pending claims for No-Fault Benefits submitted through the PC Defendants, or else to request additional verification of those claims, has not expired.

282.    Based upon the Defendants' material misrepresentations and other affirmative acts to conceal their fraud from GEICO, GEICO did not discover and could not reasonably have

discovered that its damages were attributable to fraud until shortly before it filed this Complaint.

### FIRST CAUSE OF ACTION
**Against All Defendants**
**(Declaratory Judgment – 28 U.S.C. §§ 2201 and 2202)**

283.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

284.    There is an actual case in controversy between GEICO and the Defendants regarding more than $1.4 million in fraudulent billing for healthcare services that has been submitted to GEICO.

285.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the PC Defendants were, and are, fraudulently incorporated and owned and controlled by persons not licensed to practice medicine in New York State, and therefore are ineligible to seek or recover No-Fault Benefits.

286.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the PC Defendants engaged in unlawful fee-splitting.

287.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the services were medically unnecessary and/or had been ordered and billed – to the extent that they were performed at all – pursuant to fraudulent, pre-determined protocols designed solely to maximize charges to GEICO and other insurers, not because they were medically necessary or designed to facilitate the treatment of or otherwise benefit the Insureds who purportedly were subjected to them.

288.    The Defendants have no right to receive payment for any pending bills submitted to GEICO because the bills misrepresented and exaggerated the level of services that purportedly were provided in order to inflate the charges submitted to GEICO.

289.    Oasis PT is not entitled to seek or pursue collection of No-Fault Benefits because the owner of Oasis PT illegally referred patients from professional corporations where she was purportedly employed, including Parkway Medical, and BY MD.

290.    Accordingly, GEICO requests a judgment pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, declaring that:

(i)     the Defendants have no right to receive payment for any pending bills submitted to GEICO because the PC Defendants were, and are, fraudulently incorporated, owned and/or controlled by unlicensed non-professionals (including the Management Defendants), and, therefore, are ineligible to seek or recover No-Fault Benefits;

(ii)    the PC Defendants and Nominal Owner Defendants have no right to receive payment for any pending bills submitted to GEICO because they have engaged in unlawful fee-splitting with unlicensed non-professionals (including the Management Defendants);

(iii)   the Defendants have no right to receive payment for any pending bills submitted to GEICO because the services were not medically necessary and/or were not ordered and billed in accordance with the Fee Schedule, and were performed pursuant to pre-determined fraudulent protocols designed solely to financially enrich the Defendants;

(iv)    Oasis PT has no right to receive payment for any pending bills to the extent that those bills misrepresented that the Insured was properly referred to Oasis PT for physical therapy services, when in fact Endozo actually referred Insureds from other professional corporations where she was purportedly employed, including Parkway Medical and BY MD.

## SECOND CAUSE OF ACTION
### Against Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five"
### (Violation of RICO, 18 U.S.C. § 1962(c))

291.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

292.    Parkway Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

293.    Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five" knowingly have and continue to conduct and/or participate, directly or indirectly, in the conduct of Parkway Medical's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for approximately seven months, seeking payments that Parkway Medical is not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1".

294.    Parkway Medical's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five" operated Parkway Medical, insofar as Parkway Medical never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Parkway Medical to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Parkway Medical to the present day.

68

295.   Parkway Medical is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by unlicensed non-professionals, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Parkway Medical likewise continues to engage in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Parkway Medical in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

296.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $58,000 pursuant to the fraudulent bills submitted by the Defendants through Parkway Medical.

297.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRD CAUSE OF ACTION
### Against Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five" (Violation of RICO, 18 U.S.C. § 1962(d))

298.   GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

299.   Parkway Medical is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

300.   Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five" are

employed by and/or associated with the Parkway Medical enterprise.

301.   Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Parkway Medical enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Parkway Medical was not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "1". Each such mailing was made in furtherance of the mail fraud scheme.

302.   Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

303.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $58,000 pursuant to the fraudulent bills submitted by the Defendants through Parkway Medical.

304.   By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable

attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## FOURTH CAUSE OF ACTION
### Against Parkway Medical, Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five"
### (Common Law Fraud)

305. GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

306. Parkway Medical, Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment purported healthcare services.

307. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed non-professionals; (ii) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting with unlicensed non-professionals; (iii) the representation that the services were medically necessary and performed in accordance with the requirements of the Fee Schedule, when in fact the services were not medically necessary and/or were not performed in accordance with the requirements of the Fee Schedule.

308.    Parkway Medical, Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the PC Defendants that are not compensable under the No-Fault Laws.

309.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $58,000.00, pursuant to the fraudulent bills submitted by the Defendants.

310.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

311.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### FIFTH CAUSE OF ACTION
**Against Safir, Orion Collections, and John Does "One" through "Five"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

312.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

313.    BY MD is an "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engaged in activities which affected interstate commerce.

314.    Safir, Orion Collections, John Does "One" through "Five," and Dr. Yentel (prior to his death) knowingly have conducted and/or participated, directly or indirectly, in the conduct of BY MD's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over 4

years, seeking payments that BY MD was not eligible to receive under the No-Fault Laws because: (i) it was unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "2".

315.    BY MD's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Safir, Orion Collections, John Does "One" through "Five" and Dr. Yentel operated BY MD, insofar as BY MD never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for BY MD to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through BY MD to the present day.

316.    BY MD was engaged in inherently unlawful acts, inasmuch as its very corporate existence was an unlawful act, considering that it was fraudulently incorporated, owned and controlled by unlicensed non-professionals, and its existence therefore depended on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. BY MD likewise continues to engage in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by BY MD in pursuit of inherently

unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

317.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $616,000 pursuant to the fraudulent bills submitted by the Defendants through BY MD.

318.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTH CAUSE OF ACTION
### Against Safir, Orion Collections, and John Does "One" through "Five"
### (Violation of RICO, 18 U.S.C. § 1962(d))

319.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

320.    BY MD is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

321.    Safir, Orion Collections, John Does "One" through "Five," and Dr. Yentel (prior to his death) were employed by and/or associated with the BY MD enterprise.

322.    Safir, Orion Collections, John Does "One" through "Five" and Dr. Yentel knowingly agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the BY MD enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that BY MD was not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-physicians; (ii)

it engaged in fee-splitting with unlicensed non-physicians; and (iii) the billed-for services were not medically necessary, and were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibits "2". Each such mailing was made in furtherance of the mail fraud scheme.

323. Safir, Orion Collections, John Does "One" through "Five" and Dr. Yentel knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

324. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $616,000 pursuant to the fraudulent bills submitted by the Defendants through BY MD.

325. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### Against BY MD, Safir, Orion Collections, and John Does "One" through "Five" (Common Law Fraud)

326. GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

75

327.   BY MD, Safir, Orion Collections, and John Does "One" through "Five" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment purported healthcare services.

328.   The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed non-professionals; (ii) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting with unlicensed non-professionals; (iii) the representation that the services were medically necessary and performed in accordance with the requirements of the Fee Schedule, when in fact the services were not medically necessary and/or were not performed in accordance with the requirements of the Fee Schedule.

329.   BY MD, Safir, Orion Collections, and John Does "One" through "Five" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the PC Defendants that are not compensable under the No-Fault Laws.

330.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $616,000.00, pursuant to the fraudulent bills submitted by the Defendants.

331.   The Defendants' extensive fraudulent conduct demonstrates a high degree of

moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

332.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## EIGHTH CAUSE OF ACTION
### Against Craigg, Safir, Orion Collections, and John Does "One" through "Five"
### (Violation of RICO, 18 U.S.C. § 1962(c))

333.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

334.    JR Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

335.    Craigg, Safir, Orion Collections, and John Does "One" through "Five" knowingly have and continue to conduct and/or participate, directly or indirectly, in the conduct of JR Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over a year and a half, seeking payments that JR Chiro is not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3".

336.    JR Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Craigg, Safir, Orion Collections, and John Does "One" through "Five" operated JR Chiro, insofar as JR Chiro never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for JR Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through JR Chiro to the present day.

337.    JR Chiro is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by unlicensed non-professionals, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. JR Chiro likewise continues to engage in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by JR Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

338.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $89,000 pursuant to the fraudulent bills submitted by the Defendants through JR Chiro.

339.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## NINTH CAUSE OF ACTION
### Against Craigg, Safir, Orion Collections, and John Does "One" through "Five"
### (Violation of RICO, 18 U.S.C. § 1962(d))

340.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

341.    JR Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

342.    Craigg, Safir, Orion Collections, and John Does "One" through "Five" are employed by and/or associated with the JR Chiro enterprise.

343.    Craigg, Safir, Orion Collections, and John Does "One" through "Five" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the JR Chiro enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that JR Chiro was not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "3". Each such mailing was made in furtherance of the mail fraud scheme.

344.    Craigg, Safir, Orion Collections, and John Does "One" through "Five" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO

and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

345.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $89,000 pursuant to the fraudulent bills submitted by the Defendants through JR Chiro.

346.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**TENTH CAUSE OF ACTION**
**Against JR Chiro, Craigg, Safir, Orion Collections, and John Does "One" through "Five"**
**(Common Law Fraud)**

347.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

348.    JR Chiro, Craigg, Safir, Orion Collections, and John Does "One" through "Five" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment purported healthcare services.

349.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed non-professionals; (ii) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-

3.16(a)(12), when in fact it engaged in illegal fee-splitting with unlicensed non-professionals; (iii) the representation that services were medically necessary and performed in accordance with the requirements of the Fee Schedule, when in fact the services were not medically necessary and/or were not performed in accordance with the requirements of the Fee Schedule.

350.   JR Chiro, Craigg, Safir, Orion Collections, and John Does "One" through "Five" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the PC Defendants that are not compensable under the No-Fault Laws.

351.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $89,000.00, pursuant to the fraudulent bills submitted by the Defendants.

352.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

353.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### ELEVENTH CAUSE OF ACTION
**Against Mehrzad, Safir, Orion Collections, and John Does "One" through "Five"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

354.   GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

355.   MK Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

356.   Mehrzad, Safir, Orion Collections, and John Does "One" through "Five"

knowingly have and continue to conduct and/or participate, directly or indirectly, in the conduct of MK Chiro's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over four years, seeking payments that MK Chiro is not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4".

357. MK Chiro's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Mehrzad, Safir, Orion Collections, and John Does "One" through "Five" operated MK Chiro, insofar as MK Chiro never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for MK Chiro to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through MK Chiro to the present day.

358. MK Chiro is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by unlicensed non-physicians, and its existence therefore depends on continuing

82

misrepresentations made to the New York State Department of Education and the New York State Department of State. MK Chiro likewise continues to engage in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by MK Chiro in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

359.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $213,000 pursuant to the fraudulent bills submitted by the Defendants through MK Chiro.

360.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWELFTH CAUSE OF ACTION
**Mehrzad, Safir, Orion Collections, and John Does "One" through "Five"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

361.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

362.    MK Chiro is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

363.    Mehrzad, Safir, Orion Collections, and John Does "One" through "Five" are employed by and/or associated with the MK Chiro enterprise.

364.    Mehrzad, Safir, Orion Collections, and John Does "One" through "Five" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the MK Chiro enterprise's affairs, through a pattern of racketeering

activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that MK Chiro was not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "4". Each such mailing was made in furtherance of the mail fraud scheme.

365.    Mehrzad, Safir, Orion Collections, and John Does "One" through "Five" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

366.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $213,000 pursuant to the fraudulent bills submitted by the Defendants through MK Chiro.

367.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## THIRTEENTH CAUSE OF ACTION
### Against MK Chiro, Mehrzad, Safir, Orion Collections, and
### John Does "One" through "Five"
### (Common Law Fraud)

368.     GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

369.     MK Chiro, Mehrzad, Safir, Orion Collections, and John Does "One" through "Five" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment purported healthcare services.

370.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed non-professionals; (ii) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting with unlicensed non-professionals; (iii) the representation that services were medically necessary and performed in accordance with the requirements of the Fee Schedule, when in fact the services were not medically necessary and/or were not performed in accordance with the requirements of the Fee Schedule.

371.     MK Chiro, Mehrzad, Safir, Orion Collections, and John Does "One" through "Five" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the PC Defendants that are not compensable under the No-Fault Laws.

85

372.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $213,000.00, pursuant to the fraudulent bills submitted by the Defendants.

373.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

374.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## FOURTEENTH CAUSE OF ACTION
**Bard, Safir, Orion Collections, and John Does "One" through "Five"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

375.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

376.    Bard Acu is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

377.    Bard, Safir, Orion Collections, and John Does "One" through "Five" knowingly have and continue to conduct and/or participate, directly or indirectly, in the conduct of Bard Acu's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for almost four years, seeking payments that Bard Acu is not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment

and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5".

378. Bard Acu's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Bard, Safir, Orion Collections, and John Does "One" through "Five" operated Bard Acu, insofar as Bard Acu never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Bard Acu to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Bard Acu to the present day.

379. Bard Acu is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by unlicensed non-professionals, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Bard Acu likewise continues to engage in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Bard Acu in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

380. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $159,000 pursuant to the fraudulent bills submitted by the Defendants through Bard Acu.

381. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**FIFTEENTH CAUSE OF ACTION**
**Against Bard, Safir, Orion Collections, and John Does "One" through "Five"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

382. GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

383. Bard Acu is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

384. Bard, Safir, Orion Collections, and John Does "One" through "Five" are employed by and/or associated with the Bard Acu enterprise.

385. Bard, Safir, Orion Collections, and John Does "One" through "Five" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Bard Acu enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Bard Acu was not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol

designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "5". Each such mailing was made in furtherance of the mail fraud scheme.

386.    Bard, Safir, Orion Collections, and John Does "One" through "Five" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

387.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $159,000 pursuant to the fraudulent bills submitted by the Defendants through Bard Acu.

388.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## SIXTEENTH CAUSE OF ACTION
### Against Bard Acu, Bard, Safir, Orion Collections, and John Does "One" through "Five" (Common Law Fraud)

389.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

390.    Bard Acu, Bard, Safir, Orion Collections, and John Does "One" through "Five" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment purported healthcare services.

391.     The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed non-professionals; (ii) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting with unlicensed non-professionals; (iii) the representation that services are medically necessary and are performed in accordance with the requirements of the Fee Schedule, when in fact the services were not medically necessary and/or were not performed in accordance with the requirements of the Fee Schedule.

392.     Bard Acu, Bard, Safir, Orion Collections, and John Does "One" through "Five" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the PC Defendants that are not compensable under the No-Fault Laws.

393.     GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $159,000.00, pursuant to the fraudulent bills submitted by the Defendants.

394.     The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

395.     Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

## SEVENTEENTH CAUSE OF ACTION
### Kiner, Safir, Orion Collections, and John Does "One" through "Five"
### (Violation of RICO, 18 U.S.C. § 1962(c))

396.   GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

397.   City Care Acu is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

398.   Kiner, Safir, Orion Collections, and John Does "One" through "Five" knowingly have and continue to conduct and/or participate, directly or indirectly, in the conduct of City Care Acu's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years, seeking payments that City Care Acu is not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6".

399.   City Care Acu's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Kiner, Safir, Orion Collections, and John Does "One" through "Five" operated City Care Acu, insofar as City Care Acu never has been eligible to bill for or collect No-

Fault Benefits, and acts of mail fraud therefore are essential in order for City Care Acu to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through City Care Acu to the present day.

400.    City Care Acu is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlawful act, considering that it is fraudulently incorporated, owned and controlled by unlicensed non-professionals, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. City Care Acu likewise continues to engage in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by City Care Acu in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

401.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $264,000 pursuant to the fraudulent bills submitted by the Defendants through City Care Acu.

402.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### EIGHTEENTH CAUSE OF ACTION
**Against Kiner, Safir, Orion Collections, and John Does "One" through "Five"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

403.    GEICO repeats and realleges each and every allegation set forth above as though

full set forth herein.

404.     City Care Acu is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

405.     Kiner, Safir, Orion Collections, and John Does "One" through "Five" are employed by and/or associated with the City Care Acu enterprise.

406.     Kiner, Safir, Orion Collections, and John Does "One" through "Five" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the City Care Acu enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that City Care Acu was not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "6". Each such mailing was made in furtherance of the mail fraud scheme.

407.     Kiner, Safir, Orion Collections, and John Does "One" through "Five" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

408. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $264,000 pursuant to the fraudulent bills submitted by the Defendants through City Care Acu.

409. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

**NINETEENTH CAUSE OF ACTION**
**Against City Care Acu, Kiner, Safir, Orion Collections,**
**and John Does "One" through "Five"**
**(Common Law Fraud)**

410. GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

411. City Care Acu, Kiner, Safir, Orion Collections, and John Does "One" through "Five" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment purported healthcare services.

412. The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed non-professionals; (ii) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting with unlicensed non-professionals; (iii) the representation that services are billed and performed in accordance with the requirements

of the Fee Schedule, when in fact the services were not billed and performed in accordance with the requirements of the Fee Schedule.

413.    City Care Acu, Kiner, Safir, Orion Collections, and John Does "One" through "Five" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the PC Defendants that are not compensable under the No-Fault Laws.

414.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $264,000.00, pursuant to the fraudulent bills submitted by the Defendants.

415.    The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

416.    Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper

.

### TWENTIETH CAUSE OF ACTION
**Against Endozo, Safir, Orion Collections, and John Does "One" through "Five"
(Violation of RICO, 18 U.S.C. § 1962(c))**

417.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

418.    Oasis PT is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

419.    Endozo, Safir, Orion Collections, and John Does "One" through "Five" knowingly have and continue to conduct and/or participate, directly or indirectly, in the conduct

of Oasis PT affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills on a continuous basis for over five years, seeking payments that Oasis PT is not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; (iii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; and (iv) Endozo illegally referred patients to Oasis PT from professional corporations in which she purportedly was an employee, including Parkway Medical and BY MD. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7".

420.    Oasis PT's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Endozo, Safir, Orion Collections, and John Does "One" through "Five" operated Oasis PT, insofar as Oasis PT never has been eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore are essential in order for Oasis PT to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through Oasis PT to the present day.

421.    Oasis PT is engaged in inherently unlawful acts, inasmuch as its very corporate existence is an unlicensed non-professionals, considering that it is fraudulently incorporated,

owned and controlled by non-physicians, and its existence therefore depends on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. Oasis PT likewise continues to engage in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by Oasis PT in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent No-Fault billing.

422.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $48,000 pursuant to the fraudulent bills submitted by the Defendants through Oasis PT.

423.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FIRST CAUSE OF ACTION
### Against Endozo, Safir, Orion Collections, and John Does "One" through "Five"
### (Violation of RICO, 18 U.S.C. § 1962(d))

424.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

425.    Oasis PT is an ongoing "enterprise," as that term is defined in 18 U.S.C. § 1961(4), that engages in activities which affects interstate commerce.

426.    Endozo, Safir, Orion Collections, and John Does "One" through "Five" are employed by and/or associated with the Oasis PT enterprise.

427.    Endozo, Safir, Orion Collections, and John Does "One" through "Five"

knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the Oasis PT enterprise's affairs, through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted hundreds of fraudulent bills seeking payments that Oasis PT was not eligible to receive under the No-Fault Laws because: (i) it was, and is, unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) it engaged in fee-splitting with unlicensed non-professionals; (iii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants; and (iv) Endozo illegally referred patients to Oasis PT from professional corporations in which she purportedly was an employee including Parkway Medical and BY MD. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the chart annexed hereto as Exhibit "7". Each such mailing was made in furtherance of the mail fraud scheme.

428.   Endozo, Safir, Orion Collections, and John Does "One" through "Five" knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

429.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $48,000 pursuant to the fraudulent bills submitted by the Defendants through Oasis PT.

430.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

### TWENTY-SECOND CAUSE OF ACTION
**Against Oasis PT, Endozo, Safir, Orion Collections, and John Does "One" through "Five" (Common Law Fraud)**

431.    GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

432.    Oasis PT, Endozo, Safir, Orion Collections, and John Does "One" through "Five" intentionally and knowingly made false and fraudulent statements of material fact to GEICO and concealed material facts from GEICO in the course of their submission of hundreds of fraudulent bills seeking payment purported healthcare services.

433.    The false and fraudulent statements of material fact and acts of fraudulent concealment include: (i) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it was fraudulently incorporated and actually owned and controlled by unlicensed non-professionals; (ii) in every claim, the representation that the professional corporation was properly licensed, and therefore, eligible to receive No-Fault Benefits pursuant to Insurance Law § 5102(a)(1) and 11 N.Y.C.R.R. § 65-3.16(a)(12), when in fact it engaged in illegal fee-splitting with unlicensed non-professionals; (iii) the representation that services are billed and performed in accordance with the requirements of the Fee Schedule, when in fact the services were not billed and performed in accordance with the requirements of the Fee Schedule.

434.   Oasis PT, Endozo, Safir, Orion Collections, and John Does "One" through "Five" intentionally made the above-described false and fraudulent statements and concealed material facts in a calculated effort to induce GEICO to pay charges submitted through the PC Defendants that are not compensable under the No-Fault Laws.

435.   GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $48,000.00, pursuant to the fraudulent bills submitted by the Defendants.

436.   The Defendants' extensive fraudulent conduct demonstrates a high degree of moral turpitude and wanton dishonesty that entitles GEICO to recover punitive damages.

437.   Accordingly, by virtue of the foregoing, GEICO is entitled to compensatory and punitive damages, together with interest and costs, and any other relief the Court deems just and proper.

### TWENTY-THIRD CAUSE OF ACTION
**Against Dr. Geris, Mehrzad, Kiner, Bard, Endozo, Safir, Orion Collections, and John Does "One" through "Five"**
**(Violation of RICO, 18 U.S.C. § 1962(c))**

438.   GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

439.   Parkway Medical, BY MD, MK Chiro, JR Chiro, City Care Acu, Bard Acu, and Oasis PT constitute an association-in-fact "enterprise" (the "455 Ocean Parkway Enterprise") as that term is defined in 18 U.S.C. § 1961(4), that engages in, and the activities of which affect, interstate commerce. The members of the 455 Ocean Parkway Enterprise are and have been associated through time, joined in purpose and organized in a manner amenable to hierarchal and consensual decision making, with each member fulfilling a specific and necessary role to carry out and facilitate its common purpose. Specifically, Parkway Medical, BY MD, MK Chiro, JR

Chiro, City Care Acu, Bard Acu, and Oasis PT ostensibly are independent entities – with different names and tax identification numbers – that were created as vehicles to achieve a common purpose – namely, to facilitate the submission of fraudulent charges to GEICO and other insurers. The 455 Ocean Parkway Enterprise has been operated under several separate corporate names in order to reduce the number of bills submitted under any individual name, in an attempt to avoid attracting the attention and scrutiny of GEICO and other insurers to the volume of billing and the pattern of fraudulent charges originating from any one company. Accordingly, the carrying out of this scheme would be beyond the capacity of each member of the 455 Ocean Parkway Enterprise acting individually or without the aid of each other.

440.    The 455 Ocean Parkway Enterprise is distinct from and has an existence beyond the pattern of racketeering that is described herein, namely by recruiting, employing overseeing and coordinating many professionals and non-professionals who have been responsible for facilitating and performing a wide variety of administrative and professional functions beyond the acts of mail fraud (i.e., the submission of the fraudulent bills to GEICO and other insurers), by creating and maintaining patient files and other records, by recruiting and supervising personnel, by negotiating and executing various contracts, by maintaining the bookkeeping and accounting functions necessary to manage the receipt and distribution of the insurance proceeds, and by retaining collection lawyers whose services also were used to generate payments from insurance companies to support all of the aforesaid functions.

441.    Dr. Geris, Mehrzad, Kiner, Bard, Endozo, Safir, Orion Collections, and John Does "One" through "Five" each was employed by and/or associated with the 455 Ocean Parkway Enterprise.

442.     Dr. Geris, Mehrzad, Kiner, Bard, Endozo, Safir, Orion Collections, and John Does "One" through "Five" knowingly have conducted and/or participated, directly or indirectly, in the conduct of the 455 Ocean Parkway Enterprise's affairs through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit or cause to be submitted thousands of fraudulent charges on a continuous basis for over seven and a half years seeking payments that the PC Defendants were not eligible to receive under the No-Fault Laws because: (i) they were unlawfully incorporated and owned and controlled by unlicensed non-professionals; (ii) they engaged in fee-splitting with unlicensed non-professionals; and (iii) the billed-for services were performed and billed pursuant to a pre-determined, fraudulent treatment and billing protocol designed solely to enrich the Defendants. A representative sample of the fraudulent bills and corresponding mailings submitted to GEICO that comprise, in part, the pattern of racketeering activity identified through the date of this Complaint are described, in part, in the charts annexed hereto as Exhibits "1" – "7".

443.     The 455 Ocean Parkway Enterprise's business is racketeering activity, inasmuch as the enterprise exists for the purpose of submitting fraudulent charges to insurers. The predicate acts of mail fraud are the regular way in which Orion Collections, and John Does "One" through "Five" operated the 455 Ocean Parkway Enterprise, inasmuch as the PC Defendants never were eligible to bill for or collect No-Fault Benefits, and acts of mail fraud therefore were essential in order for the 455 Ocean Parkway Enterprise to function. Furthermore, the intricate planning required to carry out and conceal the predicate acts of mail fraud implies a threat of continued criminal activity, as does the fact that the Defendants continue to attempt collection on the fraudulent billing submitted through the PC Defendants to the present day.

444.    The 455 Ocean Parkway Enterprise is engaged in inherently unlawful acts, inasmuch as the PC Defendants' very corporate existence is an unlawful act, considering that they were fraudulently incorporated, owned and controlled by non-medical professionals, and their existence therefore has depended on continuing misrepresentations made to the New York State Department of Education and the New York State Department of State. The 455 Ocean Parkway Enterprise likewise is engaged in inherently unlawful acts inasmuch as it continues to attempt collection on fraudulent billing submitted to GEICO and other insurers. These inherently unlawful acts are taken by the 455 Ocean Parkway Enterprise in pursuit of inherently unlawful goals – namely, the theft of money from GEICO and other insurers through fraudulent no-fault billing.

445.    GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1.4 million pursuant to the fraudulent bills submitted by the Defendants through the PC Defendants.

446.    By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. §1964(c), and any other relief the Court deems just and proper.

## TWENTY-FOURTH CAUSE OF ACTION
**Against Dr. Geris, Mehrzad, Kiner, Bard, Endozo, Safir, and John Does "One" through "Five"**
**(Violation of RICO, 18 U.S.C. § 1962(d))**

447.    GEICO incorporates, as though fully set forth herein, each and every allegation in the paragraphs set forth above.

448.    Dr. Geris, Mehrzad, Kiner, Bard, Endozo, Safir, Orion Collections, and John Does "One" through "Five" knowingly have agreed, combined and conspired to conduct and/or participate, directly or indirectly, in the conduct of the 455 Ocean Parkway Enterprise's affairs,

through a pattern of racketeering activity consisting of repeated violations of the federal mail fraud statute, 18 U.S.C. § 1341, based upon the use of the United States mails to submit thousands of fraudulent bills to GEICO. These acts of mail fraud include, but are not limited to, those that are described in the charts annexed hereto as Exhibits "1" – "7".

449. Each member of the 455 Ocean Parkway Enterprise knew of, agreed to and acted in furtherance of the common and overall objective (i.e., to defraud GEICO and other insurers of money) by submitting or facilitating the submission of the fraudulent charges to GEICO.

450. GEICO has been injured in its business and property by reason of the above-described conduct in that it has paid at least $1.4 million pursuant to the fraudulent bills submitted by the Defendants through the PC Defendants.

451. By reason of its injury, GEICO is entitled to treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c), and any other relief the Court deems just and proper.

## TWENTY-FIFTH CAUSE OF ACTION
### Against All Defendants
### (Unjust Enrichment)

452. GEICO repeats and realleges each and every allegation set forth above as though full set forth herein.

453. As set forth above, Parkway Medical, BY MD, MK Chiro, JR Chiro, City Care Acu, Bard Acu, Oasis PT, Dr. Geris, Mehrzad, Kiner, Bard, Endozo, Safir, Orion Collections, and John Does "One" through "Five" have engaged in improper, unlawful, and/or unjust acts, all to the harm and detriment of GEICO.

454. When GEICO paid the bills and charges submitted by or on behalf of the PC Defendants for No-Fault Benefits, it reasonably believed that it was legally obligated to make

such payments based on the Defendants' improper, unlawful, and/or unjust acts.

455.    Parkway Medical, BY MD, MK Chiro, JR Chiro, City Care Acu, Bard Acu, Oasis PT, Dr. Geris, Mehrzad, Kiner, Bard, Endozo, Safir, Orion Collections, and John Does "One" through "Five" have been enriched at GEICO's expense by GEICO's payments which constituted a benefit that Defendants voluntarily accepted notwithstanding their improper, unlawful, and unjust billing scheme.

456.    Defendants' retention of GEICO's payments violates fundamental principles of justice, equity and good conscience.

457.    By reason of the above, the Defendants have been unjustly enriched in an amount to be determined at trial, but in no event less than $1.4 million.

## JURY DEMAND

458.    Pursuant to Federal Rule of Civil Procedure 38(b), GEICO demands a trial by jury.

**WHEREFORE**, Plaintiffs Government Employees Insurance Company, GEICO Indemnity Company, GEICO General Insurance Company, and GEICO Casualty Company demand that a Judgment be entered in its favor:

A.    On the First Cause of Action against all Defendants, a declaration pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202, that the Defendants have no right to receive payment for any pending bills submitted to GEICO;

B.    On the Second Cause of Action against Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $58,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c)

plus interest;

C.    On the Third Cause of Action against Dr. Geris, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $58,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

D.    On the Fourth Cause of Action against Parkway Medical, Dr. Geris, Safir, Orion Collections, and Joh Does "One" through "Five," more than $58,000 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

E.    On the Fifth Cause of Action against Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $616,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

F.    On the Sixth Cause of Action against Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $616,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

G.    On the Seventh Cause of Action against BY MD, Safir, Orion Collections, and John Does "One" through "Five," more than $616,000 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

H.      On the Eighth Cause of Action against Craigg, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $89,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

I.      On the Nineth Cause of Action against Craigg, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $89,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

J.      On the Tenth Cause of Action against JR Chiro, Craigg, Safir, Orion Collections, and John Does "One" through "Five," more than $89,000 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

K.      On the Eleventh Cause of Action against Mehrzad, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $213,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

L.      On the Twelfth Cause of Action against Mehrzad, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $213,000, together with treble

damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

M.    On the Thirteenth Cause of Action against MK Chiro, Mehrzad, Safir, Orion Collections, and John Does "One" through "Five," more than $213,000 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

N.    On the Fourteenth Cause of Action against Bard, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $159,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

O.    On the Fifteenth Cause of Action against Bard, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $159,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

P.    On the Sixteenth Cause of Action against Bard Acu, Bard, Safir, Orion Collections, and John Does "One" through "Five," more than $159,000 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

Q.    On the Seventeenth Cause of Action against Kiner, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $264,000, together with treble

damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

R. On the Eighteenth Cause of Action against Kiner, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $264,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

S. On the Nineteenth Cause of Action against City Care Acu, Kiner, Safir, Orion Collections, and John Does "One" through "Five," more than $264,000 in compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

T. On the Twentieth Cause of Action against Endozo, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $48,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

U. On the Twenty-First Cause of Action against Endozo, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $48,000, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

V. On the Twenty-Second Cause of Action against Oasis PT, Endozo, Safir, Orion Collections, and John Does "One" through "Five," more than $48,000 in

compensatory damages, together with punitive damages, costs, interest and such other and further relief as this Court deems just and proper;

W.   On the Twenty-Third Cause of Action against Dr. Geris, Mehrzad, Kiner, Bard, Endozo, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1.4 million, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

X.   On the Twenty-Fourth Cause of Action against Dr. Geris, Mehrzad, Kiner, Bard, Endozo, Safir, Orion Collections, and John Does "One" through "Five," compensatory damages in favor of GEICO in an amount to be determined at trial but in excess of $1.4 million, together with treble damages, costs, and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c) plus interest;

Y.   On the Twenty-Fifth Cause of Action against all Defendants, more than $1.4 million for the Defendants' unjust enrichment, plus costs and interest and such other and further relief as this Court deems just and proper; and

Z.   For such other and further relief as to the Court may seem just and proper.

Dated:   Uniondale, New York
         June 23, 2015

RIVKIN RADLER LLP

By: _____

Barry I. Levy (BL 2190)
Michael A. Sirignano (MS 5263)
Joshua D. Smith (JS 3989)
926 RXR Plaza
Uniondale, New York 11556
(516) 357-3000

*Counsel for Plaintiffs, Government Employees
Insurance Co., GEICO Indemnity Co., GEICO
General Insurance Company and GEICO
Casualty Co.*

2969882